UNITED STATES of America,
Plaintiff,

v.

Frank FERNANDEZ, aka "Sapo"; Juan Garcia, aka "Topo"; Mariano Martinez, aka "Chuy"; Jimmy Sanchez, aka "Smokey"; Crispin Alvidrez, aka "Conejo"; Fernando Alvidrez, aka "Cuate"; Javier Alvidrez Duarte; Marcel Arevalo, aka "Psycho"; Daniel Bravo, aka "Sporty"; Mario Castillo, aka "Whisper"; Robert Cervantes, aka "Gypsy"; Roy Galvadon, aka "Spider"; Dominick Gonzales, aka "Solo"; David Gonzales–Contreras, aka "David Contreras–Gonzales"; Gerardo Jacobo, aka "Blanco"; Robert Mercado, Jr., aka "Gato"; Ernesto Murillo, aka "Solo"; Adrian Nieto; Rolando Ontiveros, aka "Rolo"; Sally Peters; Jesus Ramirez, aka "Juan Carlos Alvarez," aka "Dreamer"; Roland Ramirez, aka "Capone"; Jesus Rochin, aka "Gizmo"; Suzanne Schoenberg, Defendants.

No. CR 99–83(A) DOC.

United States District Court,
C.D. California.

July 27, 2001.

Manuel U. Araujo, for Frank Fernandez.

Paul E. Potter, for Juan Perez Garcia.

Ellen M. Barry for Mariano D. Martinez.

Charles Pereyra-Suarez, for Jimmy Sanchez.

Barry Levin, for Max Torvisco.

Sonia E. Chahin, for Marcel Arevalo.

Elliot R. Stanford, for Daniel Bravo.

Richard M. Callahan, Jr., for Robert Cervantes.

John Yzurdiaga, for Roy Gavaldon.

Philip Deitch, for David Gonzalez-Contreras.

Terry J. Amdur, for Robert Mercado, Jr.

Edward M. Robinson, for Ernesto Murillo.

Thomas H. Wolfsen, for Juan Alfredo Ramirez.

Michael J. Treman, for Roland Ramirez.

Karen L. Woods, for Jesus Rochin.

Stephen E. Webber, for Crispin Alvidrez.

Anthony P. Booklier, for Fernando Alvidrez.

Yolanda Barrera, for Javier Alvidrez Duarte.

Elliot R. Stanford, for Mario Castillo.

Gary M. Pohlson, for Dominick Shewmaker Gonzales.

Kimberly A. Urie, for Gerardo Jacobo.

Morton H. Boren, for Adrian Nieto.

W. Michael Maycock, for Rolando Ontiveros.

George W. Buehler, for Sally Peters.

David R. Evans, for Suzanne Schoenberg.

## *ORDER* REGARDING THE ADMISSIBILITY OF THE TESTIMONY OF MICHAEL ORNELAS AND MICHAEL GONZALES

CARTER, District Judge.

Six weeks after the start of this third phase of the Mexican Mafia trials, the government sought to call two newly discovered witnesses, Michael Gonzales and Michael Ornelas, to testify about the disposal and retrieval of the guns used in the Montebello murders. Ornelas could testify that Arevalo had brought him two .380s and asked him to hide them, while Gonzales could testify that Arevalo had asked him to get rid of the guns. In addition, Gonzales could testify that Castillo confessed to the murders, implicating himself, Arevalo, and Jacobo.

Defendants originally objected that their rights under the Confrontation Clause would be violated. Then, Castillo objected also on the grounds that in a capital case, the government is required to produce its witness list three days prior to the start of trial, pursuant to 18 U.S.C. § 3432. He argues that since Gonzales and Ornelas were not on the witness list three days before the trial, their testimony should be excluded.

The government argues that § 3432 does not require exclusion, and that if allowed in, under a recent Ninth Circuit case the testimony would not violate the Confrontation Clause and could be admitted in full.

The Court, after thorough briefing and oral argument, holds that § 3432 does indeed require exclusion of the testimony as it relates to Jacobo and Castillo. However, it does not require exclusion of testimony concerning Arevalo. At the same time, because the parties raised Confrontation Clause issues and because it may become relevant at some later date, the Court also holds that the Confrontation Clause would not be violated if the testimony concerning Jacobo and Castillo were admitted.

### I.

## SUMMARY OF PROPOSED TESTIMONY FROM INTERVIEWS AND IN-COURT HEARINGS OUTSIDE THE PRESENCE OF THE JURY

The government has interviewed both Gonzales and Ornelas and has produced copies of 302 reports of those interviews. The information in the 302s is the proposed testimony. The Court has also conducted a hearing outside the presence of the jury which has included the testimony of Michael Ornelas and Michael Gonzales.

### A. Ornelas

Michael Ornelas, aka "Clarence," was interviewed by the government and the FBI on June 15, 2001 and June 24, 2001. He primarily discussed the disposal of two .380 guns. In his first interview, he said he did not do any favors for anyone in November of 1998, primarily because he was too strung out on drugs. In the second interview, he stated that he had kept the two guns hidden, and had helped dispose of them some six months later.

Ornelas grew up with a number of the defendants, including Castillo, Jacobo, and Cervantes. He was friends and neighbors with Arevalo. Ornelas was not affiliated with gangs, though he did do drugs. He does auto body work and painting for a living, including for individuals living in the City Terrace area. He used to do detailing on Arevalo's van.

At some point late in 1998, Arevalo brought two small semi-automatic guns to Ornelas, who was at his parents' house in City Terrace. One gun was black, one was chrome, and they were wrapped in rags. Ornelas took the guns back to his house in Pico Rivera and buried them in his backyard. He assumed the guns had been used in a crime.

Ornelas believes that some time after that, Arevalo had chrome after-market rims removed from his van and replaced with stock rims. The mechanic who did this is. Johnny Arellano. Ornelas thinks the mechanic sold the rims.

Ornelas first learned that Arevalo had been arrested from television news. At some point after Arevalo's arrest, Gonzales, whom Ornelas knew to be a City Terrace gang member, came to Ornelas's house to get the guns. Together, they dug up the guns although they had some difficulty in finding them at first. They then took the guns apart. They then drove, in Ornelas's car, to various locations in Pico Rivera and Montebello. Gonzales threw a frame of one gun from a bridge over the San Gabriel River. Other parts were thrown out near the Montebello Town Center, alongside Plaza Drive. At one point, Gonzales got out of the car, ran up a hillside and threw items over a chain link fence. Ornelas showed investigators these approximate areas.

Ornelas is familiar with one of the victims, Richard. Richard's family used to own property in City Terrace. Richard was a drug dealer.

## B. Gonzales

Gonzales spoke to the FBI and the prosecution on June 24, June 26, and July 2, 2001. Generally, he discussed disposing of two guns thought to be the guns used in the Montebello murders; his connections to various defendants; and what he was told about the murders. There are incon-sistencies, at least one of which he acknowledges. The following summary is a compilation of the three interviews.

### 1. Background

Michael Gonzales is 32 years old. He was originally a member of a street gang known as Slowz 13. Other members included Arevalo and Castillo; Castillo joined after Gonzales was imprisoned again in 1994. Gonzales was in state prison between 1991 and 1993 for commercial burglary, and imprisoned again in 1994 for vehicular manslaughter related to a ·drunk driving accident. He was released on or about May 1, 1999. During that particular incarceration, Slowz 13 merged with the City Terrace gang; Gonzales was "walked" into the City Terrace gang because of his incarceration. He was not an official leader of the gang, but had some respect due to his relatively older age and prison background.

During his incarceration for vehicular manslaughter, he spoke often with Arevalo after Arevalo was released from California Youth Authority. He has known Arevalo since childhood. In 1997 and 1998, Gonzales called Arevalo every one to two weeks; Arevalo sent both money and care packages to Gonzales while Gonzales was incarcerated. Gonzales has also known Castillo since Castillo was in "pampers." He only met Jacobo, however, after Gonzales was released from prison in May 1999. He had talked with Jacobo several times previously, all while Jacobo was not in custody.

Gonzales also knows Kenneth Cervantes; it was from Cervantes that Gonzales first learned that Slowz 13 had merged with City Terrace.

Gonzales was released from prison in May 1999.

## 2. Mexican Mafia

Gonzales is familiar with the Mexican Mafia due to his time in prison. However, he also stated that he knew that Arevalo was becoming more and more involved with the Mexican Mafia between 1997 and 1998, the period when the two talked often on the phone. He told Gonzales that he was "running with the homies." Gonzales understood this to be a reference to the Mexican Mafia. On other occasions, Arevalo referenced Mono and Chuy, whom Gonzales knew to be members of the Mexican Mafia.

Gonzales also thought that Castillo was "sponsored" by the Mexican Mafia, and received much of his "juice" from Arevalo. Castillo at one point was seeing a former girlfriend who also was associated with Mexican Mafia member Mono. Castillo collected money from other neighborhoods on behalf of Arevalo. He was doing so at least during May 1999. At some unspecified time, Castillo recruited Gonzales to help him collect extortion money from the City Terrace neighborhood. Gonzales did so on a couple of occasions but did not want to be involved in that criminal activity. However, Gonzales also says that Arevalo asked him to take over Castillo's tax collection because Castillo was wanted by the police. Gonzales did so on two occasions. At some unspecified times, Gonzales warned Arevalo and others not to become involved with the Mexican Mafia.

## 3. Montebello Murders

Prior to his release in May 1999, and prior to Arevalo's arrest in February 1999, Gonzales had heard about the Montebello murders from Arevalo. In at least one phone call initiated by Gonzales from Calipatria State Prison, Arevalo implicated himself and others in the murders. At some point before New Years, 1999, Arevalo told Gonzales that he, Jacobo, and Castillo "took care of some business" in either Whittier or Montebello "for the homie." Gonzales took this to mean that they did something, such as an assault, for the Mexican Mafia.

Gonzales found out that Arevalo had been arrested when he called Arevalo's home sometime after the arrest. Arevalo's wife Mindy told Gonzales that Arevalo had been arrested for murder. At this time, Gonzales believed that Arevalo, Jacobo, and Castillo had killed someone for the Mexican Mafia.

Upon his release in May, Gonzales started asking around about Arevalo and the arrest charges. About a week after his release, he went to borrow money from Kenneth Cervantes. There, he met Jacobo for the first time, although he had spoken with him on the phone.[1] Cervantes was vague about what had happened with Arevalo.

Shortly after meeting with Cervantes, about one or two weeks after his release, Gonzales met with Castillo in front of Castillo's house. Castillo said that he and Jacobo had taken someone out "for the big homies" because that person owed the homies some money. Gonzales then scolded Castillo for getting involved in such things while his girlfriend was pregnant.

Several weeks later, Gonzales and Castillo met again at Castillo's house, and Castillo told him more details. He told him that he, Jacobo, and Arevalo were called and told to go to a shop, either a body shop, tire shop, or stereo shop, in order to locate the victim. Once there, they called an unidentified person and stated that they had found the victim and asked what to do. They were told to carry out the murder. They pulled up to the

---

1. At a hearing out of the presence of the jury on July 26, 2001, Gonzales testified that at that time he learned that Jacobo lived with Cervantes.

shop in a van; Castillo and Jacobo entered the shop and started shooting. Castillo said that the intended victim was named Richard and that Gonzales should know him as he used to live in his neighborhood. Castillo told Gonzales that Richard had "burned the wrong person" for either money or drugs.

Gonzales did not talk to Castillo again about the murders. Although the timing is somewhat confusing, in his second interview, Gonzales also said that Castillo told him "that he had used the same guns [referred to by him in a previous interview with the FBI] to commit murder at an auto body shop somewhere in either Whittier or Montebello, California."

At some point after May 1999, Arevalo passed a message to Gonzales via Mindy that Gonzales should warn Jacobo and Castillo to leave the neighborhood because they would be arrested in connection with the murder. Gonzales passed this message on to the two of them at his house.

In early June of 1999, Gonzales was told by Mindy that Arevalo wanted him to contact Ornelas, aka Clarence, to dispose of some guns. In his first interview, Gonzales said that he received a letter from Arevalo, that he recognized the handwriting and that he burned it after reading it. Later, he stated that Mindy simply passed on the message from Arevalo personally and that he had lied to protect Mindy. He was told to "get rid of the things," which he understood to mean the murder weapons, and that "Clarence" had the guns. In his interview on June 24, 2001, Gonzales states that he first went to Ornelas's parents' house in City Terrace and then went to Ornelas's house in Pico Rivera. Gonzales thought that Ornelas might be an informant.

Gonzales and Ornelas dug up the guns, both semi-automatic .380s. They then took the guns apart into two pieces, the grip and barrel, and the slide. They tried to dispose of the pieces where they would not be found. Gonzales threw the grip and barrel of the chrome gun over the south side of a bridge over the San Gabriel River, and the slide over the north side. They then drove to the area near the Montebello Town Center. Gonzales discarded the slide of the black gun in bushes at an intersection near the Town Center. They got back on the freeway, and Gonzales threw the grip and barrel at a split at the Garfield exit. Upon returning home, he called Mindy and told her that he had taken care of Arevalo's request. After Gonzales's first interview, he accompanied law enforcement to the sites.[2]

On the morning of the first attempt to arrest Castillo, Gonzales picked him up in City Terrace and drove him to his sister's house in South Central Los Angeles. Gonzales and his wife Charlene gave Castillo $150.00. Then, on either August 2 or 3, Castillo came to a party at Gonzales's house. Gonzales himself was arrested that night.[3]

## II.

## RIGHT TO COUNSEL (MASSIAH ANALYSIS)

■ Jacobo's counsel has raised the possibility of making a *Massiah* objection to the testimony of Gonzales and Ornelas. *See Massiah v. United States,* 377 U.S. 201, 202, 84 S.Ct. 1199, 1201, 12 L.Ed.2d 246 (1964). However, there is no evidence that either was a government informant at the time of the statements in question. Further, as to statements made by Arevalo and Castillo before they were arrested,

---

**2.** Law enforcement and Gonzales recovered portions of the guns.

**3.** The reasons for this arrest are not in the record but appear to be unrelated to this case.

there could not be a *Massiah* issue as no right to counsel would have attached. Any questions of whether Gonzales or Ornelas is now getting a benefit from the government in exchange for this testimony, such as a promise from the government not to charge them with aiding and abetting for their actions with the guns, goes to credibility under the *Boone* analysis.

## III.

## RIGHT TO CONFRONTATION (BOONE ANALYSIS)

█ The defendants implicated in Arevalo and Castillo's statements argue that admission of the statements against them would violate their rights under the Confrontation Clause of the Sixth Amendment. The amendment states that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." "The Confrontation Clause forbids the use of hearsay against a criminal defendant at trial unless the evidence 'falls within a firmly rooted hearsay exception' or otherwise contains 'particularized guarantees of trustworthiness.'" *United States v. Boone*, 229 F.3d 1231, 1233 (9th Cir.2000) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)).

█ In a recent case, the Supreme Court held that a non-testifying accomplice's confession to law enforcement officers violated the defendant's right to confrontation even though the confession implicated the accomplice because it did not contain guarantees of trustworthiness. *Lilly v. Virginia*, 527 U.S. 116, 139, 119 S.Ct. 1887, 1901, 144 L.Ed.2d 117 (1999).[4] The Supreme Court has not specifically addressed situations in which the confession is made to a co-conspirator or accomplice rather than law enforcement.

### A. Gonzales

#### 1. Reliability of Arevalo's and Castillo's Statements to Gonzales

The Ninth Circuit recently addressed whether an accomplice's statements to someone who is not in law enforcement are admissible under *Lilly*. In *Boone*, the Ninth Circuit held that an accomplice's statements to his girlfriend that implicated both the accomplice and the defendant were admissible against the defendant because the statements contained "particularized guarantees of trustworthiness." 229 F.3d at 1234. The accomplice-declarant and the defendant had participated in the robbery of a rug store. *Id.* at 1232. The court distinguished the situation from *Lilly* because the accomplice was not talking to law enforcement and because he did not try to shift blame. *Id.* at 1234. The accomplice was talking to his girlfriend, not law enforcement. *Id.* at 1232. The fact that the girlfriend was taping the conversation for law enforcement was unknown to the accomplice. *Id.* Therefore, at that time, he had no reason to lie. *Id.* at 1234. In addition, the accomplice did not in fact shift blame. *Id.* He inculpated himself as well as the defendant, unlike in *Lilly*. *Id.* The Ninth Circuit considers these two factors, communication with non-law enforcement, and no shifting of

4. The Court should examine the circumstances in which the statement was made; *not* whether other evidence corroborates the substance of the statement. *See Lilly v. Virginia*, 527 U.S. 116, 137–38, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999) ("[T]hat other evidence at trial corroborated portions of [the declarant's] statement is irrelevant. We have squarely rejected the notion that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness.'") (quoting *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990)).

blame, as indicia of reliability post-*Lilly*. As further indicators of reliability, the *Boone* court also considered whether the declarant's statement itself was reliable. The accomplice-declarant's statement included details that would not be likely to have been fabricated. For example, the declarant mentioned that President Bush was nearby playing golf, thus making the robbery more difficult. He also mentioned that the defendant had shooed away a customer during the robbery. *Id.* at 1232.

### a. Defendant Arevalo's statements to Gonzales throughout 1997 and 1998 indicating his membership in the Mexican Mafia

■ Gonzales intends to testify that during many phone conversations between him and Arevalo, or Psycho, during 1997 and 1998, Arevalo told him that he (Arevalo) was "running with the homies." Gonzales understood this to mean that Gonzales was associating with the Mexican Mafia. Arevalo referred to Mono and Chuy. Gonzales knew Chuy to be a Mexican Mafia member. These statements are admissible against Arevalo as party admissions under Federal Rule of Evidence 801(d)(2)(A), regardless of whether they are statements against penal interest. As the statements do not incriminate any other Defendants, they raise no *Boone* or *Bruton* problems.

### b. Defendant Arevalo's statement to Gonzales in December 1999 that Castillo, Jacobo, and Arevalo had "taken care of some business" for "the Homie"

■ This statement is admissible against Arevalo as a party admission under Rule 801(d)(2)(A).

■ It is also a reliable statement under *Boone*. First, given the facts and surrounding circumstances, this is a statement against penal interest. The defen-
dants' method of speaking, as demonstrated by the numerous tapes, indicates that "taking care of business" refers to taking care of some Mexican Mafia activities. "The Homie" is Chuy. Second, the circumstances in which the statement was made give it particularized guarantees of trustworthiness. Arevalo made the statements to Gonzales, who was a close friend of Arevalo's. They were both founding members of the Slowz 13 street gang. They spoke on the phone frequently while Gonzales was in prison in 1997 and 1998 and sent letters through Arevalo's wife, Mindy Davis. Their conversations included casual discussion of children and other matters. In the statement, Arevalo does not shift blame. He does not distinguish between his level of involvement and the level he ascribes to Castillo and Jacobo. He also had no incentive to lie to Gonzales. He also could not have been trying to curry favor from Gonzales, as Gonzales was just his buddy, not a higher up in the Mexican Mafia.

### c. Defendant Castillo's statements to Gonzales concerning his and Arevalo and Jacobo's involvement in the Montebello murders

■ Gonzales intends to testify that in May 1999, after he was released from custody and began asking around to find out what had happened with Arevalo, he met with Castillo in front of Castillo's home and Castillo told him that he and Jacobo had "taken someone out for the 'Big Homies'" because this person owed money after he "burned" someone. Gonzales also intends to testify that a couple of weeks later, he and Castillo met again and Castillo described the Montebello murders in some detail, describing what he, Blanco, and Psycho did, specifically that he and Blanco entered the shop and began shooting and that the intended victim's name was Richard.

These statements are admissible against Castillo as party admissions. The statements are also admissible against Arevalo and Jacobo as statements against penal interest that were made in a setting giving them particularized guarantees of trustworthiness, under *Boone*. The case for admission is not as strong as for Arevalo's statements to Gonzales, because Castillo and Gonzales were only long-time acquaintances rather than close friends, but the circumstances still are such that Castillo would not have had any reason to lie to Gonzales. Gonzales stated that he has known Castillo since Castillo was "in pampers." Gonzales, a friend of Arevalo's, came to Castillo to ask about what had happened to Arevalo and find out why Arevalo was in trouble with the law. Castillo had nothing to gain from lying to Gonzales. He was not trying to curry favor, as Gonzales was not a higher up in the Mexican Mafia. In these statements, he does not shift blame to others, as he fully implicates himself as one of the shooters.

### d. Defendant Arevalo's statements to Gonzales regarding collection of taxes

■ Gonzales intends to testify that Arevalo asked Gonzales to take over collection of taxes from Castillo because Castillo was thought to be wanted by law enforcement.

The government argues that the statement is not hearsay because it is an instruction to do something and that therefore it is being offered to show the effect on the listener, not for the truth of the matter asserted. The Court disagrees with the Government that this is being offered for the effect on the listener. The effect on the listener is that Gonzales did collect money on two occasions, but the Government has not explained how that

fact is relevant to any element of the crimes charged against the defendants in this case. However, the statement still appears to be non-hearsay. An instruction to do something is not an assertion and cannot be either true or false. Therefore, it is not hearsay.

### e. Defendant Arevalo's statements to Gonzales, through Mindy, regarding getting out of town and disposal of guns

■ Gonzales intends to testify that he received messages from Arevalo through Mindy, Arevalo's wife. He will testify that Mindy told him that Arevalo had asked her to tell him to tell Castillo and Jacobo to get out of town because they were wanted by law enforcement.[5] He will also testify that in mid-June of 1999, Mindy told Gonzales that Arevalo wanted Gonzales to get rid of "the things" which Gonzales understood to mean the guns. She also told him that an associate of the City Terrace gang known as "Clarence" was in possession of the guns.

■ The statements to get out of town and to get the guns are instructions. Instructions cannot be either true or false. An instruction may contain an implied assertion but it is not itself an assertive statement and thus is not hearsay under Federal Rule of Evidence 801(a)(2). *United States v. Zenni*, 492 F.Supp. 464, 469 (E.D.Ky.1980) (holding that betting instructions placed over the phone to a government agent are not hearsay).

■ The statements that Castillo and Jacobo are wanted by law enforcement and that Clarence has the guns are assertions. However, they are not being offered for the truth of the matter asserted. The Government is not trying to prove that Castillo and Jacobo were wanted by law

---

**5.** Mindy is an unavailable declarant because of the spousal privilege.

enforcement. The statement is relevant to show Arevalo's belief that they were wanted by law enforcement, his association with them, and thus his participation in the conspiracy. The statement is relevant to show this association whether or not they were, in fact, wanted by law enforcement at that time. Further, that they were wanted by law enforcement is not in dispute and is already obvious to all due to the fact that Castillo and Jacobo are currently on trial. Similarly, it is not in dispute that the guns were at Clarence's house, and thus Arevalo's statement to Gonzales through Mindy that Clarence has the guns is not being offered for the truth of the matter asserted. Instead, it is being offered to show his knowledge of the guns and his attempts to cover up the crime. It is relevant to show this whether or not he was in fact correct that the guns were at Ornelas's house.

Thus, none of the statements conveyed from Arevalo to Gonzales by Mindy are hearsay at all. They are not hearsay within hearsay and the separate levels do not need to be evaluated. Further, defendants have not cited to the Court any cases in which a non-hearsay statement was excluded as violative of the Confrontation Clause.

### 2. Gonzales's Credibility

The government and defendants dispute whether the Court, when determining whether there are particularized guarantees of trustworthiness such that a hearsay statement made against penal interest is reliable enough to be admitted against someone other than the declarant, should also consider the reliability and credibility of the person conveying the statement, the relator. Defendants make this argument because they argue that it is significant that in *Boone*, the statements were tape recorded, thus leaving no doubt that the statements were in fact made. The only issue in *Boone* was whether the statements

were true when made. In the present case, there is the additional issue of whether the statements were ever made in the first place. That is, there is the question of the reliability of the relator. This issue was not addressed in *Boone*.

In similar settings, some courts consider only the circumstances surrounding the initial statement from the declarant to the relator. *See United States v. Shukri,* 207 F.3d 412, 417–18 (7th Cir.2000); *United States v. Katsougrakis,* 715 F.2d 769, 777 (2d Cir.1983); *United States v. Atkins,* 558 F.2d 133, 135–36 (3d Cir.1977). The rationale behind these courts' approach is that the court must perform some analysis of the reliability of the declarant because the jury has no opportunity to evaluate the sincerity, accuracy, memory, and truthfulness of the out-of-court declarant, but the jury can evaluate those aspects of the relator's testimony.

At least one circuit, however, allows the trial court to evaluate both the reliability of the declarant's statement and the reliability of the relator's testimony about that statement. *See United States v. Alvarez,* 584 F.2d 694, 701 (5th Cir.1978); *United States v. Bagley,* 537 F.2d 162, 167–68 (5th Cir.1976). Under this approach, before admitting such a statement, the Court would need to be satisfied both that circumstances indicate that the declarant had no reason to lie and also that the relator is now accurately relating what was said to him or her.

The Ninth Circuit has not adopted one approach or the other. In a 1978 decision, the majority opinion discussed the rationales behind both approaches, but held that no choice had to be made on the facts of the case before it. *United States v. Satterfield,* 572 F.2d 687, 691–92 (9th Cir. 1978). One judge concurred in the result but stated that he thought a decision should be made and further that the trial

judge should be allowed, within certain parameters, to evaluate the trustworthiness of the relator. *Id.* at 694 (Sneed, J., concurring in the result). The issue did not need to be addressed in *Boone* because the statements had been tape recorded.

Given that the Ninth Circuit has not ruled on this issue, the Court holds that the better approach is that taken by the Fifth Circuit, under which the trial court may evaluate the credibility of the relator. When the relator of a hearsay statement is also charged with crimes and is a cooperating witness for the government, the relator has a significant motive to name others as being involved, as doing so inures to the relator's own benefit when he is sentenced. Further, while the jury will be the final arbiter of whether the relator is telling the truth, given that the particularized guarantees of trustworthiness analysis is in effect an exception to what would otherwise be the result under the Confrontation Clause, it should be narrowly construed to protect the accused's constitutional rights. *See generally United States v. Paguio*, 114 F.3d 928, 934 (9th Cir.1997) (stating that "[w]ere it not for the fence around the Confrontation Clause provided by the hearsay rule, prosecution use [of a hearsay statement] would implicate the accused's right to be 'confronted with the witnesses against him' " and noting that the concerns implicated by the admission of a hearsay statement vary depending on whether it is offered by the government or the defense because of defendants' constitutional rights). In addition, nothing in *Lilly* prevents courts from considering the credibility of the relator.[6]

■ Accordingly, the Court holds that in ruling on the admissibility of Gonzales's testimony regarding statements made to him, the Court may consider whether Gonzales's testimony appears to meet a minimum level of credibility and could exclude the testimony if it appears that the statements were not, in fact, ever made to Gonzales in the first place.

■ Defendants argue that Gonzales is not credible because (1) his wife, Charlene Rivera, wanted Arevalo killed and tried to get other members of La EME to carry out her desire; and (2) he has five prior felony convictions. In addition, that Gonzales changed his testimony, in his 302 statements, about how the information came to him through Mindy is a factor possibly suggesting that he is not credible. The Court held a hearing with Gonzales out of the presence of the jury and evaluated his demeanor and testimony. Gonzales is a very frightened and reluctant witness, even while under witness protection. His demeanor brings startling credibility to his testimony. Thus, the Court finds that he is credible. Defendants of course may argue to the jury that he is not.

## B. Ornelas

■ In November 1998, Arevalo asked Ornales to hide two .380 handguns for Arevalo, and to remove flashy rims that Arevalo had on his van. To the extent they would otherwise be hearsay, these statements are admissible against Arevalo as party admissions.

## IV.

## WITNESS LIST IN CAPITAL CASES

■ In capital cases, which have heightened procedural protections for the

---

**6.** Justice Stewart's plurality opinion in *Dutton* holds that the credibility and reliability of the relator is not relevant to a Confrontation Clause analysis. *See Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970). However, this opinion was joined by only three other justices and thus does not represent the holding of a majority of the Supreme Court.

defendant, the government must produce a witness list to the defendant "at least three entire days before commencement of trial." 18 U.S.C. § 3432. The government's obligation to provide a witness list "is mandatory and defendants indicted for a capital offense must be given the benefit of its provisions." *Amsler v. United States,* 381 F.2d 37, 45 (9th Cir.1967). Failure to include a witness on a witness list, which is in substance the same as failing to produce a witness list at all when the admissibility of the excluded witness's testimony is at issue, is reversible error in capital cases. *Id.; see also United States v. Crowell,* 442 F.2d 346, 347–48 (5th Cir.1971) (reversing and remanding on the grounds that the district court's failure to exact compliance with § 3432 would be plain error); *Hall v. United States,* 410 F.2d 653, 660 (4th Cir. 1969) (stating that failure to comply with § 3432 is reversible error).

Some cases draw a bright-line rule and suggest that unnamed witnesses may not, under any circumstances, testify at trial. *E.g., United States v. Neverson,* 12 D.C. (1 Mackey) 152 (Sup.Ct.D.C.1880). Other cases suggest that originally unnamed witnesses may testify when the government's failure to identify a witness prior to trial was due to circumstances beyond the government's control, rather than just lack of diligence. *Gregory v. United States,* 410 F.2d 1016, 1019 (D.C.Cir.1969); *see also Neverson,* 12 D.C. (1 Mackey) (MacArthur, J., concurring) (stating that the government should be able to call a witness not included on the witness list if the government had "us[ed] the utmost diligence and exercis[ed] the utmost good faith" but had nonetheless been unable to identify the witness prior to trial).[7] In such circumstances, the Court must also evaluate the impact of the witness on the defendant, ensuring that the defendant receives the benefits of § 3432 by having enough time to prepare for the witness and not being prejudiced. *Gregory,* 410 F.2d at 1019. The Court has been unable to locate any case which, on its facts, allowed the government to call a witness not on the witness list when the failure was due to a lesser showing, such as excusable negligence.[8]

Here, the government's failure to identify Ornelas and, through him, Gonzales, appears to be a simple mistake, but considering all the circumstances it is a mistake due to a lack of diligence and is not excusable.

Ornelas and, through him, Gonzales came to the government's attention when a new prosecutor joined the team for this phase of the trial and began reviewing

7. Similarly, in dicta the Supreme Court once stated while the case at issue did not require it to decide "how far" this rule might go, it was perhaps possible that the government could call witnesses not on the original list when the witnesses "afterwards c[ame] to the knowledge of the government, or bec[ame] necessary by reason of unexpected developments at the trial." *Logan v. United States,* 144 U.S. 263, 306, 12 S.Ct. 617, 631, 36 L.Ed. 429 (1892), *disagreed with in part on other grounds by Witherspoon v. Illinois,* 391 U.S. 510, 523 n. 22, 88 S.Ct. 1770, 1777 n. 22, 20 L.Ed.2d 776 (1968).

8. The cases cited by the government are no different. In *United States v. Rosenberg,* 195 F.2d 583, 599 (2d Cir.1952), a witness who was not named on the witness list was allowed to testify when "it was a reasonable inference from Schneider's testimony that the government did not know of Schneider until the day before he was called as a witness, [and thus] it could not have included his name in the witness-list handed defendants before the trial." Similarly, in *United States v. Schneider,* 21 D.C. 381 (Sup.Ct.D.C.1893), a witness who was not named on the witness list was allowed to testify when the prosecutor stated "that he had not known of this witness until after the testimony for the defence had been commenced ."

phone records from the day of the murders. However, defendants argue that the government potentially could have identified Ornelas through (1) Castillo's statement to local law enforcement in April 1999 and (2) Torvisco's March 1999 debriefings. In his debriefings, Torvisco said that "Clarence" had the guns and drew a map to Clarence's mother's house. Ornelas goes by the name Clarence with his close friends. The government did not know if Clarence was a true name or a moniker. The map is accurate, but it is not detailed enough to enable someone who did not have an address to find the house without going door-to-door and street-to-street asking for "Clarence." An investigator in fact went out on one occasion but could not identify the house. A search of relevant law enforcement databases produced no hits on the name "Clarence." In regard to Torvisco's testimony, the Court finds that the government exercised all reasonable diligence.

However, by failing to follow up on Castillo's statement, made to the Los Angeles Police Department detectives in April 15, 1999, the government demonstrated a lack of diligence. Castillo's statement is clear, detailed, unequivocal, and provides many significant details of the case. Castillo states that he has information about the triple homicides that occurred in Montebello on November 19, 1998. He says that Michael Ornelas has the guns and that he lives on Rogers Street in City Terrace. This is Ornelas's parents' house, a place he was frequently at. Therefore, he was easy to find and could have been interviewed far earlier than June 2001. Castillo also says that Psycho, true name Marcel Arevalo, was the getaway driver and had a blue van. Castillo says he knows the names of the shooters. His statement is clear, detailed, and potentially informative about crucial portions of the government's case: the identify of the shooters and the getaway driver, and what has happened to the murder weapons.

Further, the government in fact read this statement as it was preparing the case. The statement was bates numbered on December 27, 1999, so the government had it at least by that point. Initially, the government sought to use the statement against Castillo, and thus there was discussion with Arevalo's counsel about redacting out any mention of Arevalo. These discussions occurred in May of 2000. A court order dated May 11, 2000 confirms that the government and Arevalo's counsel had discussed the statement and their agreement clearly indicates that the government had actually looked at and read the statement. Even if the government did not originally give credence to the statement in December 1999, by May 2000, Castillo had been indicted for the murders of the three individuals in Montebello and the government also had by then developed the theory that Arevalo is the getaway driver. These developments gave credence to at least a portion of Castillo's statements.

In addition, the government only had two leads about the murder weapons: Castillo's statement and Torvisco's. While on first impression their statements about the weapons were inconsistent and not completely corroborating, investigation would have shown them to be, on the whole, consistent with each other. The government was not confronted with multiple, contradictory, false leads about the murder weapons.

In such circumstances, by failing to follow up and investigate the information provided by Castillo, the government failed to exercise reasonable diligence. The failure to talk to Ornelas before this phase of the case began was not something out of the government's control. When questioned at a hearing on July 26, 2001 regarding

follow-up on the statement, Detective Larry Martinez of the Los Angeles Police Department, with commendable honesty, agreed that the government's failure was a mistake and something they should have caught. He explained that Castillo's statement was inconsistent with Torvisco's statements, and when the statement first surfaced Torvisco was viewed as more reliable than Castillo. However, he agreed that later, by May 2000, Castillo's statement should have been investigated.

The Court finds that the government has at all times acted in good faith. However, good faith alone is not enough; it must be combined with diligence. Good faith alone is not enough because the statute could be easily obviated by a claim of good faith. Section 3432 is not a forgiving statute. Because of the societal interest in ensuring that the death penalty is imposed only as a result of the most reliable and fair procedures our system can offer, § 3432 does not excuse sloppiness or negligence on the part of the government.

However, not all mistakes or oversights should be treated the same. Here, the significance of Castillo's statement now is perhaps bolstered somewhat by hindsight, as the statement turns out to match the government's theory nearly completely except that Castillo says that "Spanky" rather than he was one of the shooters. In addition, the volume of evidence in this case cannot be overstated. The tape transcripts alone fill an entire room. This is the third group of defendants to be tried on this indictment. The first two trials last approximately six months each and this third one is estimated to last the same amount of time. If Castillo were the only defendant and there were only ten pieces of paper evidence, failure to follow up on the statement would be so sloppy and egregious that it would be inexcusable. Here, however, it is somewhat understandable that a lead would be missed and not

followed up on. It is not excusable, but it is understandable.

If the government had intentionally left a name off the list, or acted in bad faith by providing no list at all, or displayed a lack of reasonable diligence that was not understandable under any circumstances, it would be appropriate to bar the new witness from testifying completely, without further consideration of the impact of the testimony on the defendants. Here, however, the Court will also weigh the impact on the capital defendants. This is particularly appropriate when, as here, defendants also had access to Castillo's statement at all relevant times. Thus, defendants also had seen the name of Michael Ornelas much earlier than when it came up in the midst of this phase of the trial.

One of the main benefits of § 3432 is to allow capital defendants ample time to prepare for witnesses prior to testimony. That benefit can be achieved here. Defendants have known about the government's discovery of Ornelas and Gonzales for at least a month. The Court will entertain a request for a further continuance from Jacobo and Castillo.

Defendants also argue that they would be prejudiced if Ornelas and Gonzales are allowed to testify because defendants have already cross-examined Torvisco on some of the same topics as contained in Gonzales's and Ornelas's proposed testimony, namely the guns. Their cross-examination was intended to suggest to the jury that Torvisco was lying about the guns being buried in Pico Rivera. If Gonzales and Ornelas now corroborate Torvisco's testimony, it might appear to the jury that defense counsel are not credible. In addition, the cross-examination has drawn the jury's attention to the issue of the guns and their burial. Thus, the defense's cross-examination has indirectly helped

the government's case. In addition, Jacobo and Castillo would have preferred to be able to plan for witnesses with information as significant and probative, if believed, as the proposed testimony of Gonzales and Ornelas from the beginning of the case.

The Court does not discount these potential forms of prejudice. However, Ornelas and Gonzales did come to light during the portion of this trial that included Torvisco's testimony. He was asked about Clarence at the end of his testimony and identified Clarence's photograph. Thus, defendants did have some opportunity to shape their cross-examination of him based on the knowledge that the government had identified Ornelas and Gonzales and, through them, found the guns.

Further, at this point no option is perfect. Here, the Court must weigh two serious and sometimes competing concerns. On the one hand, the rights of defendants in capital cases are important and to be protected. Complete exclusion would satisfy this concern. On the other hand, the truth-finding function of our court system is of vital importance to this Court and must be considered carefully in this case. Complete exclusion would potentially distort the truth-finding function because it would allow, for example, the jury to draw an inference that the murder weapons were never found when there is strong evidence to suggest that they have been located.

Weighing these concerns, the Court will allow Ornelas and Gonzales to testify but only in part. First, the government may not call Gonzales and Ornelas as witnesses against Jacobo or Castillo if it continues to proceed against them as death-eligible defendants. The government may call them against either or both of these defendants if it withdraws its notices of intent to seek the death penalty against them. *See Hall*, 410 F.2d at 660 (government "disavowed any intention of seeking the capital penal-

ty" when defense counsel and district court raised issue of failure to comply with § 3432). As discussed earlier, the Court would then allow Gonzales to testify in full, without redaction, under *Boone*.

Second, § 3432 does not apply to rebuttal witnesses, and thus if Castillo or Jacobo's defense case includes testimony that could be rebutted by Ornelas or Gonzales, they may testify in rebuttal.

Third, the government may call Gonzales and Ornelas to testify about their interactions with Arevalo and what they did with the guns. The Court recognizes that this testimony inferentially and indirectly bolsters the government's case that Castillo and Jacobo are the shooters. However, it does not incriminate them directly. Given the competing concerns at issue, and especially given that Castillo and Jacobo will have enough time to prepare for cross-examination of Gonzales and Ornelas, this minimum level of prejudice is acceptable. In addition, the jury will be given a limiting instruction that it may consider the statements as evidence only relating to Arevalo.

Thus, Gonzales and Ornelas may testify as follows:

Gonzales's testimony must exclude all references to Jacobo or Castillo. For example, he may not testify (1) about his conversations with Castillo; (2) about his relationships with Jacobo and Castillo; (3) that he was told to tell them that they should get out of the neighborhood; (4) that they "took care of some business"; (5) that he thought that Castillo and Jacobo had murdered someone; and (6) that he collected taxes for Castillo on two occasions. This list is not exhaustive, but illustrative only.

Gonzales's testimony about conversations with Arevalo are admissible as the statement of a party opponent. Fed.

R.Evid. 801(d)(2)(A). Gonzales's conversation with Mindy concerning the guns is admissible because she was conveying an instruction and thus the statement is not hearsay. Instructions are neither true nor false. An instruction may contain an implied assertion but it is not itself an assertive statement and thus is not hearsay under Federal Rule of Evidence 801(a)(2). *United States v. Zenni,* 492 F.Supp. 464, 469 (E.D.Ky.1980) (holding that betting instructions placed over the phone to a government agent are not hearsay).

Gonzales may testify about his conversations with Mindy concerning the guns, Arevalo's "taking care of business," and Arevalo's membership in the Mexican Mafia. The rest of his testimony concerning the recovery and disposal of the guns is also admissible, subject to the ordinary rules of evidence.

Ornelas may testify about his interactions with Arevalo and about the guns. He may not testify about knowing Jacobo and Castillo as members of the City Terrace gang.

## V.

### CONCLUSION

For the reasons stated above, the Court holds that in the unique circumstances of this case, the appropriate remedy for the government's failure to include Ornelas and Gonzales on the witness list is a partial exclusion of these witnesses' testimony. They may not testify in any way that directly incriminates Jacobo or Castillo. However, they may testify about Arevalo and about the actions they took with the guns.

IT IS SO ORDERED.