**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

v.

CHADRICK EVAN FULKS,
　　　　　　*Defendant-Appellant.*

⎫
⎬　No. 04-33
⎭

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Joseph F. Anderson, Jr., Chief District Judge.
(CR-02-992)

Argued: May 23, 2006

Decided: July 27, 2006

Before WIDENER, WILLIAMS, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Widener joined. Judge Williams wrote a concurring opinion.

---

## COUNSEL

**ARGUED:** John Henry Blume, III, CORNELL LAW SCHOOL, Ithaca, New York, for Appellant. Scott Newton Schools, Assistant United States Attorney, EXECUTIVE OFFICE FOR U.S. ATTORNEYS, Washington, D.C., for Appellee. **ON BRIEF:** Keir M. Weyble, BLUME & WEYBLE, L.L.C., Columbia, South Carolina; William F. Nettles, IV, Assistant Federal Public Defender, OFFICE

OF THE FEDERAL PUBLIC DEFENDER, Florence, South Carolina, for Appellant. Reginald I. Lloyd, United States Attorney, Jonathan S. Gasser, Assistant United States Attorney, John C. Duane, Assistant United States Attorney, C. Todd Hagins, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Chadrick Evan Fulks appeals from the death sentence imposed on him in the District of South Carolina on his federal convictions for carjacking and kidnapping resulting in the death of Alice Donovan in 2002. By this appeal, Fulks makes seven contentions of error, each of which relate to his 2004 capital sentencing trial in Columbia: (1) the district court erroneously permitted the prosecution to present testimony from two witnesses not included on its pretrial witness list; (2) the court abused its discretion in qualifying three jurors who were unconstitutionally prone to impose the death penalty; (3) the court abused its discretion in denying Fulks a new trial on the basis of a juror's failure to disclose during voir dire that her first husband had been murdered; (4) the court abused its discretion in qualifying two jurors whose life experiences rendered them incapable of impartially deciding Fulks's case; (5) the court abused its discretion in excluding testimony concerning three polygraph examinations of Fulks; (6) the court abused its discretion in permitting Donovan's sister to read to the jury a 1990 letter that Donovan had written her; and (7) the court erred in concluding that the relaxed evidentiary standard applicable to capital sentencing proceedings is constitutional. As explained below, we reject these contentions and affirm.

I.

A.

Fulks, who grew up in the tri-state area around Huntington, West Virginia, began dating an exotic dancer named Veronica Evans in

April 2002. Shortly thereafter, Fulks, who was then twenty-five years old, began living with Evans and her three-year-old son Miles in the eastern Kentucky community of Lewisburg. On June 11, 2002, Fulks and Evans were married. Fulks supported his new family in the same way he had supported himself for years — by breaking into cars and stealing. And as he had with other women, Fulks often became violent with Evans, sometimes beating her severely and assaulting her sexually.

On August 25, 2002, Fulks directed Evans to use a stolen credit card to buy a necklace at a Wal-Mart in Madisonville, Kentucky. Upon entering the store, Evans reported to police that Fulks was in the parking lot with a gun and that she was afraid he would kill her. The police responded and searched Evans's car, discovering, among other things, stolen credit cards and a pistol. The officers subsequently arrested Evans and Fulks and transported them to the Hopkins County Detention Center (the "HCDC"). Three-year-old Miles was placed in foster care. On August 27, 2002, Evans agreed to cooperate with the government and was released from the detention center. On the basis of evidence seized from their home, Fulks was ultimately charged with twelve counts of credit card fraud in Hopkins County, Kentucky.

Branden Basham had been housed at the HCDC on bad check charges for over a year when Fulks arrived in late August 2002. According to guards at the prison, Basham was disruptive and annoying, often pestering his fellow inmates. In order to protect him from other prisoners, Basham was frequently reassigned cell mates, and, in mid-October 2002, he was placed in a cell with Fulks. On November 3, 2002, after about two months in custody, the Kentucky State Police served Fulks with an indictment charging him with first degree abuse of a child aged twelve years or younger (Miles). The next evening, at approximately 6:30 p.m., a jailer released Fulks and Basham, at Basham's request, into an outdoor recreation area. The jailer became diverted administering medication to other inmates, and when she returned at about 8:00 p.m. to check on Fulks and Basham, they were gone. They had escaped from the HCDC through the ceiling of the recreation area by using a makeshift rope made of blankets and sheets.

By the following day, November 5, 2002, Fulks and Basham had made their way on foot to the residence of James Hawkins, about eight to twelve miles from the HCDC. Basham approached the residence and, after using the phone, persuaded Hawkins to drive him and Fulks to a nearby convenience store. Shortly after departing from the house, Hawkins agreed to drive Fulks and Basham to their car, which they claimed to be located about forty miles away in Robards, Kentucky. At some point, Basham pulled a knife on Hawkins, and Fulks ordered Hawkins to pull to the side of the highway so that Fulks could drive. Soon thereafter, Fulks stopped the truck on a remote state road, intending to abandon Hawkins. Basham started to tie Hawkins to a tree, but Fulks, dissatisfied with Basham's effort, soon took over the job. Once Fulks was convinced that Hawkins would be unable to escape, he and Basham departed in Hawkins's truck. Hawkins freed himself some fifteen hours later, hailed a passing motorist, and called the police. According to Hawkins's testimony at trial, although Basham held him at knifepoint throughout the carjacking incident, Fulks remained in charge, with Basham merely following Fulks's orders.

After leaving Hawkins, Fulks and Basham drove to Portage, Indiana, where, on November 6, 2002, they abandoned Hawkins's truck at a hotel and proceeded on foot to a trailer shared by Tina Severance and Andrea Roddy. Fulks had met Severance at the Westville (Indiana) Correctional Institute in 2001, while he was serving time there and she was working as a correctional officer. After a few hours in the trailer, Fulks and Basham became very nervous, and the four of them (Fulks, Basham, Severance, and Roddy) travelled in Severance's van to the Sands Motel in northern Indiana, where they spent the next two nights. At some point while at the Sands Motel, Fulks told Severance that he had escaped from prison because he feared a lengthy prison sentence on the pending child abuse charges. During their second night at the Sands Motel, Fulks asked Severance if she knew where they could obtain firearms. She replied that a friend, Robert Talsma, kept firearms at his home in nearby Michigan City, Indiana. On the morning of November 8, 2002, in accordance with a preconceived plan, Severance and Roddy lured Talsma away while Fulks and Basham broke into his home and stole several firearms, as well as a ring and some checks.

The four of them then drove Severance's van to Sturgis, Michigan, where they rented a motel room. Basham and Roddy spent the night of November 8, 2002, at the motel, while Fulks and Severance spent that night in Goshen, Indiana, smoking marijuana and methamphetamine with Fulks's brother, Ronnie Fulks. The next day, Fulks and Severance returned to the Sturgis motel to find Basham crouched on the floor holding a gun. Apparently convinced that the authorities had caught up with them, Basham was highly agitated, repeatedly asserting that he was going to shoot a police officer. He eventually calmed down, and the four then drove to the Indiana home of Ronnie Fulks, where they spent the night.

On November 10, 2002, Fulks, Basham, Severance, and Roddy, with Fulks driving Severance's van, travelled to Piketon, Ohio, where they checked into a Town and Country Motel. They then drove to a nearby Wal-Mart, where Basham wrote bad checks for items that Roddy later returned for cash. Also on November 10, 2002, at a K-Mart in Piketon, Ohio, Fulks met a young woman with a butterfly tattoo (later determined to be Heather Jacobi) with whom he used drugs. On that same date, Fulks stole a purse and cell phone belonging to nineteen-year-old Amy Ward from a vehicle parked at a Wal-Mart in Waverly, Ohio. On the following day, Fulks, Basham, Severance, and Roddy drove to Kenova, West Virginia, and rented a room at the Hollywood Motel. Fulks and Basham then left the motel, not to return until the early morning hours of November 12, 2002.

According to statements Fulks made to the FBI in 2003, after he and Basham left the Hollywood Motel on November 11, 2002, they smoked methamphetamine and then drove to the Barboursville Mall, near Huntington, West Virginia, intending to break into cars and steal purses. When they arrived at the mall, they split up. The next time Fulks saw Basham, he was driving a car up and down the rows of the parking lot and yelling Fulks's name. In the passenger seat was the owner of the car, a nineteen-year-old Marshall University student named Samantha Burns. After spotting Basham, Fulks returned to Severance's van and followed Basham and Burns to a Foodland grocery store, where Fulks left the van and began driving Burns's car. They then visited several automatic teller machines and withdrew cash from Burns's account. They later returned to the Foodland to retrieve the van, at which point Basham announced that he wanted to

find a place to rape Burns. Fulks then followed Basham in Sever-
ance's van to a secluded area by the Ohio River. Fulks parked some
distance from Burns's car, and in such a way that his view of the pas-
senger side of the car was obstructed. He observed Basham exit the
driver's side of the car and walk around to the passenger's side. He
saw nothing else until about twenty minutes later when Basham —
alone — drove Burns's car to where Fulks was parked and informed
Fulks that he wanted to burn the vehicle in order to remove any fin-
gerprints. After buying gasoline, Basham set fire to Burns's car on a
rural road near Lavalette, West Virginia, and he and Fulks returned
to the Kenova motel. From that point forward, Basham wore, on a
chain around his neck, a heart-shaped ring that was later determined
to belong to Burns. Although both Fulks and Basham have admitted
that Burns is dead, her body has never been recovered.[1]

On November 12, 2002, Fulks, Basham, Severance, and Roddy
drove the van to Little River, South Carolina, where Fulks had lived
during the late 1990s. During their trip to Little River, Basham repeat-
edly taunted Severance by asking whether she wanted to go "swim-
ming" in the Ohio River. Fulks eventually ordered Basham to stop
teasing Severance, and Basham complied. When the four of them
arrived at Little River, they checked in at the Lake Shore Motel. Fulks
and Basham spent the following day, November 13, 2002, breaking
into cars and stealing purses. On November 14, the four left Little
River for the Beach Walk Hotel in Myrtle Beach, South Carolina.
After checking in, Fulks and Basham left the hotel in Severance's
van.

At around 2:00 p.m. on November 14, 2002, Carl Jordan stumbled
upon Fulks and Basham burglarizing his son's residence outside Con-
way, South Carolina. According to Jordan, both Fulks and Basham
fired gunshots at him, with Fulks shooting out the back window of
Jordan's truck.[2] Jordan then attempted to retreat in his truck, with

---

[1]In connection with Burns's death, Basham and Fulks each received
sentences of life imprisonment in the Southern District of West Virginia,
after pleading guilty to the federal offense of carjacking resulting in
death, in contravention of 18 U.S.C. § 2119.

[2]A defense expert testified at trial that the trajectory of the bullet that
shattered the window of Jordan's truck belied Jordan's belief that Fulks
had fired the shot.

Fulks and Basham following in Severance's van. Fulks and Basham eventually gave up the chase, abandoned Severance's van, and stole a white pickup truck. They then made their way to a Wal-Mart store in Conway, South Carolina, where, according to Fulks's 2003 statements to the FBI, they planned to steal a car.

At 2:37 p.m. that same day, a Wal-Mart surveillance camera recorded a blue BMW driven by Alice Donovan enter the Wal-Mart parking lot, with Fulks and Basham following closely behind. As Donovan parked, Basham exited the truck and approached the BMW while Fulks circled the row of vehicles and parked opposite the BMW. Both vehicles then began moving again, travelling outside the range of the cameras. Fulks soon abandoned the pickup truck and began driving the BMW, with Basham and Donovan in the back seat. After leaving the Wal-Mart parking lot, Fulks and Basham made several (some successful) attempts to withdraw money from Donovan's account at various automatic teller machines. At some point, they crossed into North Carolina and stopped at a cemetery, where first Basham and then Fulks raped Donovan. According to Fulks's statements to the FBI, he did not want to rape Donovan but felt pressure from Basham to do so. They then reentered South Carolina and, according to Fulks, Basham ordered him to stop along a dirt road so that they could leave Donovan tied up, in order to prevent her from contacting the authorities. Fulks complied with this request and Basham, carrying a gun but no rope or tape that Fulks could see, began leading Donovan away from the car. Donovan implored Fulks to convince Basham to leave the gun in the car, but Basham refused to do so. Basham then led Donovan into the woods and out of Fulks's sight. He returned twenty minutes later, alone. As with Burns, both Fulks and Basham have admitted that Donovan was killed, but her body has never been found.

Fulks and Basham then returned to the Beach Walk Hotel in Myrtle Beach, where they informed Severance and Roddy that the police were in possession of the van, and that Fulks and Basham needed to return to West Virginia alone. According to Fulks, it was on their return journey to West Virginia that Basham first informed him that he had killed Burns and Donovan. On November 15, 2002, Fulks and Basham arrived in Huntington, West Virginia, and spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a

friend of Fulks. McGuffin testified that, during the time she spent with Fulks and Basham, Fulks controlled what he and Basham did.

Two days after arriving at McGuffin's home, on November 17, 2002, Fulks and Basham drove to the Ashland Mall in nearby Ashland, Kentucky, where they planned to break into cars. At around 7:30 p.m., in the Ashland Mall parking lot, Basham attempted to carjack Deanna Francis and her fifteen-year-old daughter. After Francis reported the incident, a police officer spotted Basham and began to pursue him on foot. Basham initially eluded the officer by running behind some railcars, but he was apprehended at around 9:00 p.m. that evening, hiding across the railroad tracks in the Ohio River.

Fulks returned to McGuffin's home late that same evening and was there when the television stations reported Basham's arrest. The following day, November 18, 2002, Fulks left Huntington in Donovan's BMW for his brother's home in Goshen, Indiana. That evening, an Ohio State Trooper, having observed the BMW and ascertained that it was stolen, attempted to apprehend Fulks at a rest area near Marion, Ohio. Following a highway chase reaching speeds of 130 miles per hour, Fulks narrowly escaped. He arrived at his brother's home in Indiana on the evening of November 19, 2002, and, on the morning of November 20, 2002, hid the BMW in a barn near Bristol, Indiana. Police officers had earlier set up a surveillance operation at Fulks's brother's home and, on the afternoon of November 20, 2002, after a brief foot chase, Fulks was finally apprehended.

B.

1.

Fulks and Basham were initially indicted in the District of South Carolina on December 17, 2002. On April 23, 2003, the grand jury returned a superseding indictment charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the death penalty on the first two counts: carjacking resulting in Donovan's death (18 U.S.C. § 2119), and kidnapping resulting in Donovan's death (18 U.S.C. § 3571).[3]

---

[3]In addition to the carjacking and kidnapping offenses, Fulks and Basham were indicted for the following offenses: (1) interstate transpor-

On September 12, 2003, the prosecution notified Fulks and Basham of its intention to seek the death penalty against them on the carjacking and kidnapping counts. Thereafter, on January 29, 2004, the district court granted Fulks and Basham a trial severance. On March 5, 2004, the court issued an order denying, inter alia, Fulks's motion to strike the death penalty on the basis that the Federal Death Penalty Act, in rendering the Federal Rules of Evidence inapplicable to capital sentencing proceedings, contravened constitutional due process.

On May 4, 2004, Fulks tendered pleas of guilty to all eight counts in the superseding indictment. With regard to the carjacking and kidnapping counts on which the prosecution was seeking the death penalty, Fulks admitted in the plea colloquy to raping Donovan but disclaimed any knowledge of or participation in her murder. The substance of his admission tracked his 2003 statements to the FBI, in which he generally admitted his involvement in the crime spree but claimed that Basham had killed both Burns and Donovan without his knowledge. The district court accepted Fulks's guilty pleas on May 7, 2004.

On May 10, 2004, the prosecution, as required by 18 U.S.C. § 3432, provided Fulks with a list of the names and addresses of 181 potential trial witnesses. Among those potential witnesses was Amy Ward, whose purse and cell phone Fulks had stolen on November 10, 2002, in Waverly, Ohio. On May 21, 2004, defense investigator Pete Skidmore met with Amy Ward and her mother, Donna Ward, seeking to determine whether Amy was the young woman with the butterfly tattoo with whom Fulks had used drugs during the escapade. At this meeting, Donna advised Skidmore that she had received a phone call on November 17, 2002, from a man purportedly seeking to meet with

---

tation of a stolen motor vehicle (18 U.S.C. § 2312); (2) conspiracy to commit numerous offenses, including carjacking and kidnapping (18 U.S.C. § 371); (3) conspiracy to use firearms in furtherance of a crime of violence (18 U.S.C. § 924(o)); (4) use of a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)); (5) being felons in possession of firearms (18 U.S.C. § 922(g)(1)); and (6) possession of stolen firearms (18 U.S.C. § 922(j)).

Amy at a local hardware store that evening at 10:30 p.m. to discuss her recent job application with the store. Donna, knowing that Amy had submitted no such job application, became suspicious, but when she attempted to ascertain the caller's identity, he hung up. Donna also told Skidmore at the May 21, 2004 meeting that she believed the caller to be the same person who had stolen Amy's purse and cell phone. Although Skidmore claims he notified Fulks's lawyers of the November 17, 2002 phone call to Donna Ward, they have no such recollection.

Jury selection was conducted in the district court from May 10 to May 21, 2004. As relevant here, Fulks challenged for cause venirepersons Richard Goehring, Lisa Harvey, and Sylvia Allison on the ground that the strength of their beliefs in favor of the death penalty rendered each of them unwilling to consider any mitigating evidence that he would offer. Fulks also challenged for cause venirepersons Joni Novinger and Elizabeth Plyler, contending that their personal experiences rendered them incapable of impartially serving on his jury. Specifically, Fulks asserted that Novinger's ability to be impartial was impaired by the fact that her sister had been the victim of a sexual assault, and that Plyler's impartiality was impaired because she and her daughter were roughly the same ages (respectively) that Donovan and Burns had been when they were killed. The district court rejected each of these challenges and qualified these five venirepersons over Fulks's objections.

2.

Fulks's sentencing trial commenced on June 1, 2004, with the prosecution's opening statement. In its opening, the prosecution, anticipating Fulks's strategy of casting Basham as the leader of their crime spree and the actual murderer, forecast the evidence it would introduce to demonstrate that Fulks played an active, if not leading, role in the entire criminal enterprise. Among other things, the prosecution advised the jury that it would hear evidence that the crime spree touched on places with which Fulks — not Basham — was familiar, that shortly after their prison escape Fulks had asked Severance where he could obtain guns, that Fulks had tied Hawkins to the tree where he was abandoned, and that both Fulks and Basham had fired at Jordan when he discovered them burglarizing his son's residence.

In response, defense counsel countered in its opening statement with a forecast of the evidence it planned to present, suggesting that Basham — rather than Fulks — was the leader, instigator, and killer. For example, defense counsel advised the jury it would learn that Basham had lured Hawkins from his home and held him at knifepoint, had carried a gun throughout the crime spree, had expressed his intention of killing a police officer while in the Sturgis motel room, had asked Severance whether she wanted to go "swimming" in the Ohio River the day after Burns was murdered, and had worn Burns's ring around his neck. In addition to the evidence depicting Basham as the leader, defense counsel outlined its case for mitigation, explaining that the jury would hear that Fulks was a victim of Fetal Alcohol Spectrum Disorder, and had been raised in abject poverty by alcoholic, abusive parents who neglected his education, encouraged criminality, and failed to provide him with the basic necessities of life. Finally, in tying its two main points together, defense counsel asserted that once the jury learned more of Fulks's life, background, and criminal history, it would understand that the murders of Donovan and Burns were not crimes Fulks would have committed on his own.

On June 2, 2004, prior to the commencement of the prosecution's case-in-chief, the court granted the prosecution's motion to exclude testimony concerning three privately administered polygraph examinations, the results of which indicated that Fulks had truthfully disclaimed knowledge of, or participation in, the murders of Burns and Donovan. The prosecution then presented testimony from the first of approximately a hundred witnesses that it called during its three-week presentation of evidence.

Amy Ward, who was scheduled to testify on June 11, 2004, arrived in South Carolina on June 10, accompanied by her father Byron Ward. Just prior to Amy's testimony, Byron, while engaged in small talk with FBI Agent Jeff Bruning, mentioned the November 17, 2002 phone call his wife Donna had received regarding Amy's purported job application at the hardware store. Agent Bruning soon began investigating whether the call could be traced to Fulks, and, with the assistance of the Sprint telephone company, discovered that the phone call had been placed using a prepaid phone card found in Fulks's possession at his arrest. With further investigation, it was established that the call had been placed at 8:38 p.m. on November 17, 2002. Because

Basham was hiding from the police in the Ohio River at that very moment, the timing of the call appeared to conclusively establish that Fulks, acting alone, had placed the call. On June 17, 2004, the court ruled that Donna Ward and Agent Bruning could testify regarding the call even though they had not been included on the prosecution's pre-trial witness list. The court then offered Fulks a three-day trial hiatus so that he could prepare to meet their testimony, but Fulks's counsel declined the offer, stating that a three-day recess would be useless at that point in the trial.

The prosecution's final witness, presented on June 22, 2004, was Donovan's sister Judy Ezell. Ezell, a victim impact witness, primarily testified concerning the sexual abuse she and Donovan had suffered as children at the hands of their father. Over Fulks's objection, the court permitted Ezell to read to the jury a letter Donovan had written to her, congratulating her on confronting their father about the abuse and explaining that Donovan had decided to leave her abusive husband and start a new life.

Fulks presented testimony to the jury from June 22 to June 25, 2002. That testimony consisted primarily of mitigating evidence, detailing Fulks's miserable childhood as well as his asserted mental deficiencies. Fulks also presented the testimony of Heather Jacobi and Pete Skidmore, through which Fulks attempted to explain that, by his November 17, 2002 call to Donna Ward, he was not trying to lure a new victim (Amy Ward), but rather was attempting to locate the young woman with the butterfly tattoo with whom he had used drugs. Jacobi, the young woman with the butterfly tattoo, testified that she had met Fulks in November 2002 at a K-Mart parking lot in Portsmouth, Ohio, a city about thirty miles from Waverly, Ohio, where Fulks, on November 10, 2002, had stolen Amy Ward's purse and phone from her car. Skidmore's testimony served largely to corroborate what Jacobi had said.

The parties delivered their closing arguments to the jury on June 29, 2004. On the following day, the jury returned a unanimous verdict, recommending that Fulks be sentenced to death on both the carjacking and kidnapping counts.

3.

Shortly after the verdict was announced, defense counsel first learned — by virtue of a July 1, 2004 article on Fulks's trial in the Myrtle Beach *Sun News* — that juror Allison's husband had been murdered in 1971, six weeks after the couple had been married and while she was pregnant with their child. Prior to jury selection, Allison, along with all other prospective jurors, was required to complete a written juror questionnaire. As relevant here, Allison left blank Question 42, which inquired into whether she or any close relatives had been a crime victim.

On July 9, 2004, Fulks moved for a new trial on the basis of Allison's failure to disclose her husband's murder. On July 16, 2004, the district court conducted a hearing to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias. At the hearing, Allison testified that her failure to answer Question 42 was inadvertent. She asserted that her selection for the jury surprised her and that she had hoped her husband's murder would lead to her being dismissed from the venire. When asked by the court whether there was "even any remote possibility" that her husband's murder "had some influence in [her] deliberations," Allison responded, "None at all." J.A. 3046.

On December 20, 2004, the district court denied Fulks's motion for a new trial and imposed sentence: death on the kidnapping count, a separate sentence of death on the carjacking count, and a total of 744 months in prison on the remaining six counts, to run consecutively to the two death sentences. Fulks has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

By this appeal, Fulks makes seven contentions: (1) the district court committed reversible error in permitting the prosecution to present the testimony of Amy Ward and Agent Bruning despite its failure to include them on the pretrial witness list furnished to Fulks; (2) the court abused its discretion in qualifying jurors Goehring, Harvey, and Allison, each of whom Fulks asserts were unconstitutionally prone to

impose the death penalty; (3) the court abused its discretion in deny-
ing Fulks a new trial on the basis of juror Allison's failure to disclose
her husband's murder; (4) the court abused its discretion in qualifying
jurors Novinger and Plyer, whose personal experiences assertedly
rendered them biased against him; (5) the court abused its discretion
in excluding evidence regarding the results of three polygraph exami-
nations of Fulks, which indicated that Fulks had truthfully disclaimed
knowledge of and participation in the murders of Burns and Donovan;
(6) the court abused its discretion in permitting Donovan's sister Judy
Ezell to read to the jury the 1990 letter Donovan had written to her
concerning the abuse she had suffered at the hands of her father and
first husband; and (7) the court erred in upholding the constitutional-
ity of the relaxed evidentiary standard applicable to capital sentencing
proceedings. We assess each of these contentions in turn.[4]

## A.

Fulks first contends that the district court committed reversible
error in allowing the prosecution to present the trial testimony of
Donna Ward and Agent Bruning, neither of whom were included on
the pretrial witness list it provided to Fulks pursuant to 18 U.S.C.

---

[4]In addition to analyzing each of Fulks's appellate contentions, we are
obliged to "review the entire record" and consider two issues not raised
by him: (1) whether his sentence "was imposed under the influence of
passion, prejudice, or any other arbitrary factor;" and (2) whether the evi-
dence supports the jury's "special finding of the existence of an aggravat-
ing factor required to be considered under section 3592." *See* 18 U.S.C.
§ 3595. Accordingly, we have reviewed the entire record in this case,
including "the information submitted during the sentencing hearing[,] . . .
the procedures employed in the sentencing hearing[,] and . . . the special
findings returned under section 3593(d)." *See* § 3595(b). On the basis of
such review, we conclude that Fulks's sentence was not imposed under
the influence of passion, prejudice, or any other arbitrary factor. Indeed,
the record reflects that the trial court conducted the proceedings in an
exemplary manner, maintaining decorum and ensuring fairness through-
out. And we similarly conclude that the evidence supports the jury's spe-
cial finding that Donovan's death, or the injury that caused her death,
occurred during Fulks's "commission or attempted commission of, or
during his immediate flight from[ ] his commission of[,] a kidnapping."
*See* J.A. 2960; *see also* § 3592(c)(1).

§ 3432. *See United States v. Fulks*, CR-02-992 (D.S.C. June 23, 2004). Although no court has yet determined the standard of appellate review applicable to a trial court's decision to permit the testimony in a capital case of a witness not included on the prosecution's pretrial witness list, decisions regarding whether a witness should be allowed to testify are generally reviewed for abuse of discretion. *See Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.*, 41 F.3d 182, 188-89 (4th Cir. 1994) (observing that decision to allow witness to testify even though his identity had not been revealed before trial reviewed for abuse of discretion); *see also United States v. Moreland*, 437 F.3d 424, 430 (4th Cir. 2006) (noting that decision to allow expert testimony is reviewed for abuse of discretion); *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002) (observing that restriction on cross-examination is reviewed for abuse of discretion); *United States v. Montgomery*, 262 F.3d 233, 244 (4th Cir. 2001) (noting that refusal to allow testimony from witness who violates sequestration order is reviewed for abuse of discretion). We see no reason to apply a different standard of review in this case, especially since any error of law in the district court's application of § 3432 would constitute an abuse of discretion. *See United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005) (observing that, "[b]y definition, a court abuses its discretion when it makes an error of law" (internal quotation marks omitted)).

1.

Pursuant to § 3432 of Title 18, the prosecution was obliged to furnish Fulks with a witness list at least three days before his sentencing trial began. More specifically, § 3432 provides:

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court

finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.[5]

As the Supreme Court explained many years ago in its leading case on this provision, the purpose of § 3432 is "to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defence." *Logan v. United States*, 144 U.S. 263, 304 (1892). In other words, § 3432 is designed to prevent trial by ambush where a defendant's life is at stake.

Fulks first asserts that, in a capital sentencing trial, § 3432 categorically precludes the testimony of any witness not included on the prosecution's pretrial list and that permitting such testimony constitutes per se reversible error. In support of this proposition, Fulks relies on our decision in *Hall v. United States*, where we observed that "[p]rovision for [the] capital list is mandatory, and failure to provide it in a capital case is ordinarily reversible error." 410 F.2d 653, 660 (4th Cir. 1969); *see also United States v. Lee*, 374 F.3d 637, 651 (8th Cir. 2004) (citing *Hall* for same proposition); *United States v. Crowell*, 442 F.2d 346, 348 (5th Cir. 1971) (concluding that failure to provide witness list is "plain error"); *Amsler v. United States*, 381 F.2d 37, 45 (9th Cir. 1967) (same). In this case, however, the prosecution did not fail to timely provide Fulks with a pretrial witness list; indeed, it provided Fulks with the list of witnesses a full three weeks prior to trial. Instead, the prosecution sought to present the testimony of two witnesses it discovered only after it had provided Fulks with the witness list and after the deadline for providing the list had expired. Whether the prosecution should be permitted to present the testimony of these after-discovered witnesses is a question on which § 3432 is silent.

---

[5]As § 3432 makes clear, the prosecution is not required to provide the list if the court finds that provision of the list would endanger any person. And the Supreme Court has recognized that § 3432 does not require the prosecution to include rebuttal witnesses on the list. *See Goldsby v. United States*, 160 U.S. 70, 76 (1895). Neither of these exceptions applies here. The court made no finding on endangerment, and the prosecution presented the testimony of Donna Ward and Agent Bruning during its case-in-chief.

Although the Supreme Court has not decided the issue, in *Logan* it left open the possibility that "particular witnesses, afterwards coming to the knowledge of the government, or becoming necessary by reason of unexpected developments at the trial, might be permitted, on special reasons shown, and at the discretion of the court, to testify in the case." 144 U.S. at 306. In the years following *Logan*, virtually every court to have directly addressed the question of after-discovered witnesses has determined that § 3432 does not categorically preclude such witnesses from testifying at trial. *See United States v. Greene*, 497 F.2d 1068, 1082 (7th Cir. 1974); *United States v. Rosenberg*, 195 F.2d 583, 599-600 (2d Cir. 1952); *United States v. Fernandez*, 172 F. Supp. 2d 1265, 1279-80 (C.D. Cal. 2001); *United States v. Gregory*, 266 F. Supp. 484, 487 (D.D.C. 1967).[6]

We agree with the proposition that § 3432 imposes no per se bar against testimony from witnesses discovered after the prosecution's witness list is due. That witnesses are sometimes discovered in the midst of a trial, even after the most diligent pretrial investigation, is simply a reality of the litigation process. And to construe § 3432 to categorically preclude the testimony of such witnesses in capital trials would unnecessarily subvert the truth-seeking function of criminal proceedings, by precluding the introduction at trial of material evidence.

That said, it is beyond question that permitting the prosecution to present witnesses not included on the pretrial witness list deprives the defendant of the notice which § 3432 is designed to provide. Thus, as an initial matter, the prosecution should not be entitled to present an after-discovered trial witness unless it was without fault in failing to discover the witness prior to the expiration of the deadline established in § 3432. This means that the prosecution may not present a trial witness who was not included on its witness list unless its failure to list the witness was a good faith omission. *See Rosenberg*, 195 F.2d at

---

[6]The only contrary decision appears to be *United States v. Neverson*, 12 D.C. (1 Murphy) 152 (1880), where the court interpreted § 3432 "literally" to preclude any witness not on the witness list from testifying at trial. Importantly, that decision was implicitly abrogated thirteen years later in *United States v. Schneider*, 21 D.C. (Tuck. & Cl.) 381, 412 (1893).

599-600 (requiring demonstration that prosecution furnished pretrial witness list in good faith before permitting presentation at trial of after-discovered witness); *see also Greene*, 497 F.2d at 1082 (citing *Rosenberg* for same proposition). This proposition also means that the prosecution may not present an after-discovered witness at trial if its failure to discover the witness prior to the expiration of the deadline established in § 3432 was due to a lack of reasonable diligence in conducting its pretrial investigation. *See Fernandez*, 172 F. Supp. 2d at 1280 ("Because of the societal interest in ensuring that the death penalty is imposed only as a result of the most reliable and fair procedures our system can offer, § 3432 does not excuse sloppiness or negligence on the part of the government."); *Gregory*, 266 F. Supp. at 487 (requiring showing of diligence and good faith before permitting presentation of after-discovered witness).

In assessing this contention, we are mindful as well of the purpose which § 3432 seeks to achieve: "to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defence." *Logan*, 144 U.S. at 304; *see also Hall*, 410 F.2d at 661 (observing that purpose of § 3432 is to prevent surprise and provide defendant with "opportunity to prepare to examine witnesses and to meet their testimony"). And we recognize that, in certain situations, permitting a trial witness not included on the prosecution's witness list to testify against the defendant will undermine this statutory purpose, even when the prosecution is not at fault in failing to include the witness on its list. Thus, if a defendant can demonstrate that permitting an after-discovered witness to testify would cause him "actual prejudice" in the form of unfair surprise, a trial court should first consider whether a brief adjournment to allow the defendant to meet the witness's testimony would eliminate the prejudice caused by the surprise. *United States v. Tipton*, 90 F.3d 861, 889 (4th Cir. 1996); *see also Rosenberg*, 195 F.2d at 600 (discussing possibility of adjournment upon showing of surprise). Where such a trial adjournment would fail to cure the prejudice, the court should preclude the witness from testifying. *See Greene*, 497 F.2d at 1082 (permitting after-discovered witness to testify where defendant could not show prejudice); *cf. Tipton*, 90 F.3d at 889 (concluding that failure to include addresses of witnesses does not mandate reversal absent showing of prejudice); *Hall*, 410 F.2d at 661 (allowing trial testimony of witnesses not included on list where defendant had knowledge they

would testify). In so ruling, we emphasize that the focus of the prejudice inquiry is not the extent to which the after-discovered witness's *testimony* would be damaging to the defendant's case; rather, the prejudice must result from the *lack of notice* that the witness would testify.

In sum, a witness not included on the prosecution's § 3432 pretrial witness list should only be permitted to testify at trial in a capital case when the prosecution has demonstrated that its failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation. Even then, if the defendant can demonstrate actual prejudice resulting from the lack of pretrial notice that the witness would testify, the trial court should preclude the witness from testifying unless a brief adjournment of the trial would cure the prejudice. With these principles in mind, we turn to the contention that the district court erroneously permitted Donna Ward and Agent Bruning to testify for the prosecution at Fulks's sentencing trial.

2.

First of all, Fulks does not assert that the prosecution's failure to include Donna Ward and Agent Bruning on its witness list was in bad faith. He does, however, contend that its failure was due to a lack of diligent investigation, and that he was actually prejudiced as a result. We assess these contentions in turn.

a.

With regard to his diligence contention, Fulks contends that, had the Government conducted a diligent investigation prior to trial, it would have discovered the November 17, 2004 call to Donna Ward prior to the expiration of the § 3432 deadline for provision of the witness list. Specifically, he asserts that the prosecution should have done two things prior to trial, either of which would have led to the discovery of the phone call: (1) travelled to the Wards' home in Waverly, Ohio, to conduct an interview of Amy Ward (who was included on the witness list), and (2) followed up on the phone card found in Fulks's possession at the time of his arrest. The district court explicitly concluded, however, that the prosecution was not dilatory in discovering the phone call and that a reasonable investigation

would not have discovered the call. Because the trial court is in the best position to evaluate a party's pretrial investigation, and because this diligence inquiry forms a part of the court's decision on whether to permit the trial testimony of an after-discovered witness, we review the court's determination that the prosecution was diligent for abuse of discretion. *Cf. S. States Rack & Fixtures, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (observing that determination whether nondisclosure of evidence was "substantially justified" under Federal Rule of Civil Procedure 37(c)(1) is reviewed for abuse of discretion).

First, we reject Fulks's contention that a reasonable investigation on the part of the prosecution necessarily would have included a face-to-face, pretrial interview of Amy Ward. As the prosecution points out, Amy was a minor witness, who testified for only about five minutes concerning a matter entirely collateral to the main issues in the case — that her purse and cell phone were stolen from a vehicle in Ohio on November 10, 2002. Moreover, the prosecution had no reason to believe that the Wards had any useful information to offer, beyond the fact that Amy's purse and cell phone had been stolen. Finally, because of the considerable distance between Waverly, Ohio (where Amy Ward lived), and Columbia, South Carolina (where Fulks's trial was conducted), the prosecution made the decision to conduct a quick pre-testimony interview when Amy and her father arrived in South Carolina for the trial. The district court did not abuse its discretion in concluding that this decision was reasonable under the circumstances.

Fulks's second contention in this regard — that the prosecution should have followed up on the phone card found on Fulks at the time of his arrest, over nineteen months prior to trial — is more troublesome to us than his first contention. For its part, the prosecution asserts that it had no indication that an inquiry into the calls made using the phone card would further the primary objectives of its pretrial investigation: proving that Fulks was understating his role in the multiple offenses committed during the crime spree and countering his case for mitigation. Tracing the calls Fulks made during the crime spree, however, could easily have led to individuals and information, unknown to the prosecution, that would have shed light on Fulks's role in the offenses. Indeed, the prosecution would have discovered

the November 17, 2004 call to Donna Ward, if it had followed up on the phone card. Nevertheless, as the prosecution points out, this trial presented unique challenges for everyone, in that the crime spree spanned several states and touched over a hundred individuals the prosecution expected to call as witnesses. In these circumstances, we are unable to conclude that the district court abused its discretion in concluding that the prosecution was diligent in its pretrial investigation, despite its failure to follow up on the calls made using the phone card.

b.

Fulks also asserts that the lack of pretrial notice that Donna Ward and Agent Bruning would testify for the prosecution irreparably prejudiced his defense. Again, because a trial court's vantage point enhances its ability to discern prejudice to a party's trial presentation, and because the prejudice inquiry forms part of the court's determination of whether an after-discovered witness should be permitted to testify, we review for abuse of discretion its conclusion that Fulks suffered no prejudice from the lack of notice that Donna Ward and Agent Bruning would testify. *Cf. S. States Rack & Fixtures*, 318 F.3d at 597 (observing that decision whether nondisclosure of evidence was "harmless" under Federal Rule of Civil Procedure 37(c)(1) is reviewed for abuse of discretion). And, as an initial matter, we observe that the district court, in denying Fulks's motion to exclude the testimony of Donna Ward and Agent Bruning, offered Fulks a three-day hiatus to prepare to meet their testimony, an offer Fulks declined as useless. Thus, our inquiry focuses on whether any prejudice to Fulks was such that only outright exclusion of the after-discovered witnesses was warranted.

According to Fulks, his trial strategy was twofold: to cast Basham as the instigator and sole murderer, and to present a strong case of mitigation based on Fulks's mental problems and troubled childhood. Thus, defense counsel's opening statement emphasized numerous facts suggesting that Basham was more volatile, dangerous, and controlling, and it outlined the evidence detailing Fulks's miserable childhood and asserted mental deficiencies. Throughout the prosecution's case-in-chief, Fulks's lawyers crafted the manner in which they cross-examined witnesses to further this strategy. Fulks contends that the

testimony concerning the November 17, 2004 phone call completely undermined the first half of this strategy by tending to show that Fulks, acting independently of Basham, attempted to lure another victim, Amy Ward. And according to Fulks, the tardiness of the notice he received that Donna Ward and Agent Bruning would testify for the prosecution made it impossible for him to switch gears and pursue a different strategy. He contends that, had he been aware prior to trial that the prosecution intended to call Donna Ward and Agent Bruning, he would have pursued a different trial strategy. He would perhaps have focused exclusively on mitigation, perhaps focused on his impulsiveness (a trait defense counsel claimed it downplayed at trial because it was inconsistent with the Basham-as-instigator theory), or perhaps adhered to his not guilty plea and forced the prosecution to prove the entirety of its case.

As the prosecution points out, however, Fulks chose to pursue his trial strategy in the face of an abundance of evidence casting Fulks as an equal, if not leading, partner in the crime spree. Perhaps most damagingly, both Hawkins and McGuffin testified that Basham took orders from Fulks and that Fulks was continually in charge of what the two of them did. Furthermore, the prosecution presented evidence suggesting that Fulks instigated the Kentucky prison break because he was afraid of being sentenced to a lengthy term of imprisonment on child abuse charges that he learned of the day before the escape. And Tina Severance testified that Fulks, not Basham, approached her about obtaining firearms shortly after their escape. Although Basham also fired shots when Jordan discovered the two of them burglarizing his son's home, Jordan testified that Fulks fired at him as well. Finally, throughout the crime spree, Fulks and Basham only travelled to places with which Fulks was familiar, and they did so with Fulks behind the wheel. The testimony concerning the November 17, 2002 call to Donna Ward was certainly damaging to Fulks's case, but viewed in the context of the trial evidence suggesting Fulks's leading role in the crime spree, it was hardly the silver bullet Fulks makes it out to be.

Moreover, Fulks was able to present the jury with an alternative explanation of why he had called Donna Ward on November 17, 2002. Although his defense lawyers felt that the three days offered by the court was insufficient to prepare Fulks to testify concerning the

call, Fulks presented testimony from both Jacobi and Skidmore suggesting that Fulks, in making the call, was trying to contact the young woman with the butterfly tattoo with whom he had used drugs, and not attempting to lure Amy Ward. Perhaps more importantly, the prosecution's version of the story — that Fulks was trying to lure Amy Ward to the hardware store — hardly paints Fulks as an effective predator. Even if Fulks had been able to persuade Donna Ward that her daughter had applied for a job at the hardware store, and that she had an interview for the position at the unlikely hour of 10:30 p.m., Amy presumably would have known that she had not applied for such a job and would not have shown up for the purported "interview." That Fulks, acting alone, made such a bungled attempt to bait another victim might have actually bolstered Fulks's position that he could not have committed the offenses he was accused of on his own.

Finally, the fact that the defense team had notice, as early as May 21, 2004, of the November 17, 2002 phone call, further undermines Fulks's claim of prejudicial surprise. As spelled out above, defense investigator Pete Skidmore learned of the call during his interview of Donna Ward on May 21, 2004, when he travelled to Waverly, Ohio, seeking to determine whether Amy was the girl with the butterfly tattoo. Although the defense lawyers do not recall being notified of the call, they do not dispute that Skidmore advised them of the call via email. To be sure, of course, our inquiry under § 3432 centers on the surprise occasioned by the prosecution's failure to timely notify the defendant that a witness will testify; it does not focus on whether the substance of the testimony itself is a surprise. Nevertheless, although Fulks's knowledge of the call does not carry the day, it at least cuts against his claim of surprise, for he should have anticipated that the prosecution might discover the call and seek to apprise the jury of its existence.

For the foregoing reasons, the district court did not abuse its discretion in concluding that Fulks suffered no prejudice as a result of the prosecution's failure to include Donna Ward and Agent Bruning on its pretrial witness list. Accordingly, the court did not err in permitting them to testify on behalf of the prosecution at trial.

### B.

Fulks next asserts that the court erroneously qualified jurors Goehring, Harvey, and Allison over his objection. According to Fulks, the

district court was obliged to excuse these jurors for cause because their responses to questions on voir dire revealed that they would not properly consider the mitigation evidence offered by Fulks, rendering them disqualified to sit on his jury under the Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719 (1992). "[B]ecause [the] inquiry turns in a large part on assessments of demeanor and credibility we cannot duplicate," we review for abuse of discretion the determination of whether a juror is excludable for cause. *United States v. Barnette*, 211 F.3d 803, 812 (4th Cir. 2000).

The Supreme Court has ruled that a juror should be excluded for cause if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation marks omitted). And, in a capital sentencing proceeding, a juror's duties include giving meaningful consideration to any mitigating evidence that the defendant can produce. *See Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) (observing that sentencer may not refuse to consider any mitigating factor). Thus, where voir dire examination reveals that a juror "will fail in good faith to consider the evidence of . . . mitigating circumstances as the instructions require him to do," he is excludable for cause. *Morgan*, 504 U.S. at 729; *see also Boyde v. California*, 494 U.S. 370, 377-78 (1990) (observing that jury must "be able to consider and give effect to" mitigating evidence); *Tipton*, 90 F.3d at 878 (noting that *Morgan* requires the exclusion of jurors who "would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law"). And "[i]f even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729. Thus, if the district court abused its discretion in determining that Goehring, Harvey, or Allison would consider the mitigating evidence offered by Fulks, Fulks is entitled to a new sentencing trial. We assess its rulings on these jurors seriatim.

1.

The court commenced voir dire of juror Goehring by explaining that an individual at the extremes, who would either always or never impose the death penalty, is ineligible to serve on the jury. The court advised Goehring that it needed jurors "in the middle" who could base

their decision on the law and the facts. J.A. 573. Goehring assured the court that he could do so. In response to questions by defense counsel, however, Goehring asserted that he would automatically impose the death penalty on a defendant who had committed a knowing and intentional murder. But when defense counsel inquired about "circumstances presented about the defendant's life and background, unrelated to the offense," Goehring responded that such circumstances would "weigh[ ] into my decision." *Id.* at 577-78. He expressed his belief that "abuse" and like circumstances were relevant, but that "say 90 percent of the time, I mean unless its something outrageous," he would vote for the death penalty. *Id.* at 578. Where there was evidence that the defendant was responsible for two murders, he asserted that mitigating factors would "become less." *Id.* at 579. In response to questions by the prosecution, Goehring again asserted that he would consider and "process" mitigating evidence. *Id.* at 583. The court qualified Goehring over Fulks's objection.

Although the issue may be close, the court did not abuse its discretion in qualifying Goehring to serve on Fulks's jury. As we have recognized, *Morgan* only requires the exclusion of jurors who would categorically reject any mitigating evidence offered by the defendant. *See Tipton*, 90 F.3d at 878; *see also Yeatts v. Angelone*, 166 F.3d 255, 265 (4th Cir. 1999) (observing that only those jurors who would fail to consider mitigating evidence must be removed for cause). Although Goehring initially advised defense counsel that he would automatically impose the death penalty on any defendant who committed a knowing and intentional murder, he also repeatedly asserted that he would consider mitigating evidence. Nevertheless, according to Fulks, Goehring's statement that he would vote for the death penalty "90 percent of the time" belies the truth of his assertions that he would consider mitigating evidence and demonstrates a strong predisposition toward imposing the death penalty. We agree with Fulks that Goehring's "90 percent" statement reveals that only a strong case for mitigation would convince him that a convicted murderer deserves mercy. That fact alone, however, did not require his exclusion, for although a juror must be willing and able to consider mitigating evidence, he is entitled to "determine the weight to be given" to any such evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). Taken as a whole, Goehring's statements demonstrate that he was willing to consider the mitigating evidence that Fulks could muster. That he

might not accord such evidence as much weight as his fellow jurors did not render his qualification by the court an abuse of discretion.

2.

The court began juror Harvey's voir dire examination in the same manner as it began Goehring's, explaining to her that it was looking for jurors between the extremes of those who would always or never impose the death penalty. It then inquired whether she could consider mitigating evidence offered by the defendant, after hearing evidence from the prosecution that the defendant was responsible for two murders. She responded that she could. In response to questioning by defense counsel, Harvey first asserted that she would impose the death penalty for any knowing and intentional killing, but then said "it just depends on what the facts are." J.A. 644. After further inquiry, she stated that she would automatically impose the death penalty if the defendant committed two murders, but she seems to have been confused by the questioning. Although the record is not entirely clear on this point, it appears that Harvey did not understand that, as a juror in this case, she would be permitted to consider evidence of a second murder even though Fulks was only being tried for one. For example, when Fulks's lawyer explained that she would hear evidence concerning two murders, Harvey responded, "I would be for the case we are doing." *Id.* at 647. And when the court asked her whether hearing about two murders would "cause [her] to become so prejudiced against the defendant that [she] would not go forward and hear his case in mitigation before making up [her] mind," Harvey responded, "No, no, no, no. No. I mean, just because he killed two people, I would be listening to all the facts but basing it on the one that we were trying." *Id.* at 648. By the end of this exchange, Harvey seemed to grasp the fact that she would be legally permitted to consider both murders, and she ultimately assured the court that she would impose the death penalty if warranted by the facts, "but not just because he killed two people." *Id.* at 650. The court then qualified Harvey over Fulks's objection.

The facts with respect to juror Harvey's voir dire examination serve to underscore why the appellate courts provide the district courts substantial latitude on the qualification of trial jurors. As best we can surmise from the transcript of the voir dire proceedings, Har-

vey was confused by the questions from both the court and defense counsel, and it is not entirely clear that her confusion had dissipated by the end of her voir dire examination. Although she gave some answers that plainly satisfy the *Morgan* standard, certain other answers suggested that she may have been unwilling to consider mitigating evidence in the face of evidence that Fulks had committed two murders. In qualifying Harvey over Fulks's objection, however, the court remarked that "[i]t's a close call, but as I said, just hearing her demeanor, I think her answers were the best she could do given her limited education. She struck me as an honest person who would sincerely try to do her job in the way she's supposed to." J.A. 665. Given the difficulty in gleaning anything constitutionally relevant from the cold transcript of Harvey's voir dire examination, the court's determination on this point is entitled to our deference. And because Harvey ultimately asserted that she would not impose the death penalty solely on the basis of two murders, the court did not abuse its discretion in qualifying her to sit on Fulks's jury.

### 3.

The court began voir dire of juror Allison as it had with Goehring and Harvey, explaining to her that only those individuals "in the middle," not those who would always or never impose the death penalty, could serve on the jury. J.A. 708-09. During this exchange, Allison assured the court that she was willing to consider mitigating evidence, and when questioned about whether she would impose the death penalty for a double murder, she responded, "I — I would have to go — listen to the whole case, I wouldn't decide it just on that." *Id.* at 714. In response to questioning by the defense lawyers, Allison asserted that she would not automatically impose the death penalty, explaining that "I'm willing to listen to whatever is said and make my decision, at that time, that's all I can tell you." *Id.* at 722. When defense counsel inquired whether she could hold firm to a position opposed by her fellow jurors, she equivocated, but she later told the court she could stick with her position if she was "entirely convinced" that her position was correct. *Id.* at 726. The court qualified Allison over Fulks's objection.

Fulks contends that, because Allison only advised his lawyers that she would "listen" to mitigating evidence, she never committed to

meaningfully considering such evidence. In so contending, however, Fulks is reading her voir dire statements too literally. Viewing her examination as a whole, we think it highly unlikely that Allison meant to imply, by use of the word "listen," that she intended to listen to the evidence but entirely disregard it. The trial court — which unlike us was in the best position to view Allison's demeanor and assess her credibility — was convinced that she would carefully weigh all the evidence. That finding, given Allison's answers on voir dire, is entitled to deference. Finally, Fulks asserts that the trial court should have disqualified Allison because she equivocated on whether she could hold true to a position opposed by her fellow jurors. Her later statement to the court that she could hold firm to an unpopular position if entirely convinced of its correctness, however, cures any deficiency in her earlier equivocating statement. As a result, Fulks's appellate contentions on juror Allison must also be rejected.[7]

---

[7]In addition to challenging the district court's qualification of Goehring, Harvey, and Allison, Fulks asserts that the manner in which the district court conducted their voir dire examinations deprived him of a fair trial. Specifically, he maintains that the court's questions were too general to satisfy *Morgan*. In addition to establishing that a capital defendant is entitled to a jury that will consider mitigating evidence, the Court in *Morgan* concluded that such a defendant must also receive the benefit of a voir dire "adequate" to identify unqualified jurors. *See* 504 U.S. at 729. Although the Court concluded that general questions concerning whether a juror would "follow the law" or be "impartial" are inadequate to protect a defendant's right to a jury that would not automatically impose the death penalty, *see id.* at 735, it did not spell out the types of voir dire questioning that is required. In our *Tipton* decision, however, we ruled that inquiring into whether a juror "would always vote to impose the death penalty in every case where a defendant is found guilty of a capital offense" would be sufficient to satisfy the *Morgan* principle. 90 F.3d at 878-79. In this case, the court asked each juror whether he or she would automatically impose the death penalty for capital murder, inquired into how each juror would vote when faced with evidence of a double murder, and permitted Fulks to extensively question the prospective jurors concerning their views on the death penalty. Such an examination was plainly sufficient to satisfy *Morgan*.

## C.

### 1.

Fulks next asserts that the district court erred in denying his motion for a new trial on the basis of juror Allison's failure to disclose her husband's murder in a timely manner. *See United States v. Fulks*, CR-02-992 (D.S.C. Dec. 23, 2004). We review a district court's denial of a motion for a new trial for abuse of discretion. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). As discussed above, each prospective juror completed a written questionnaire prior to jury selection. Question 42 of the questionnaire inquired whether the prospective juror or a close relative had ever been the victim of a serious crime. Although her husband had been murdered in 1971, just after the couple was married, Allison left Question 42 blank. Unfortunately, neither the court nor the lawyers for either party inquired during voir dire into why Allison had failed to answer Question 42.[8]

Fulks first learned of the murder of Allison's husband by virtue of a July 1, 2004 article in the Myrtle Beach *Sun News*. On July 9, 2004, Fulks moved for a new trial, asserting that Allison's failure to disclose her husband's murder and the related circumstances demonstrated that she had been biased against him. The district court conducted a hearing on the issue on July 16, 2004, in order to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias. At the hearing, Allison advised that her failure to answer Question 42 had been inadvertent. Moreover, she asserted that she was surprised that she had been selected for the jury and had hoped that her husband's murder would lead to her dismissal from the venire. When the court asked whether there was "even any remote possibility" that her husband's murder "had some influence in [her] deliberations," Allison responded, "None at all." J.A. 3046.

---

[8]The prosecution does not contend on appeal that, by failing to inquire during voir dire into Allison's failure to answer Question 42, Fulks has waived any claim relating thereto.

By its order of December 23, 2004, the court denied Fulks's motion for a new trial. Applying the test established by the Supreme Court in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the court first found that, had Allison fully answered Question 42, it would not have excluded her for cause. In this respect, the court observed that it had qualified a juror, over Fulks's objection, who had been robbed at gunpoint and another whose relative had been the victim of a murder-suicide. The court also noted that, in Basham's trial, it had qualified over objection a juror whose daughter had been raped twenty-four years earlier. Based on its explicit finding that Allison honestly believed she had disclosed her husband's murder, the court further concluded that Fulks had failed to show that Allison was actually biased. Finally, the court ruled that the circumstances surrounding her husband's murder and her failure to disclose it were not extreme enough to warrant a finding of implied bias.

2.

Under the *McDonough* test, a party is entitled to a new trial on account of a prospective juror's nondisclosure on voir dire if it can

> first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

464 U.S. at 556. As we have heretofore recognized, the Supreme Court, in spelling out the *McDonough* test, did not "'foreclose the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury.'" *Fitzgerald v. Greene*, 150 F.3d 357, 363 (4th Cir. 1998) (quoting *McDonough*, 464 U.S. at 556 (Blackmun, J., concurring)). After *McDonough*, "'it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.'" *Id.* (quoting *McDonough*, 464 U.S. at 556-57 (Blackmun, J., concurring)). The doctrine of implied bias is a principle "limited in application to those

extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988). Examples of such situations include revelations "'that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'" *Fitzgerald*, 150 F.3d at 365 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).

Fulks first contends that he is entitled to relief under *McDonough*. As discussed above, the district court concluded that Fulks failed to satisfy the second part of the *McDonough* test (that a correct response would have provided a valid basis for a challenge for cause) because the court would not have excused Allison for cause even if she had fully answered Question 42. Given this explicit conclusion, Fulks's *McDonough* claim necessarily fails unless the court would have committed reversible error — that is, abused its discretion — in failing to dismiss Allison for cause. *See United States v. Turner*, 389 F.3d 111, 115 (4th Cir. 2004) (observing that we review challenges to qualifications of jurors for abuse of discretion). As our precedent makes clear, a failure to excuse a prospective juror for cause constitutes an abuse of discretion in only two situations: (1) where a per se rule of disqualification applies; and (2) where the court "demonstrates a clear disregard for the actual bias" of the juror. *Id.* at 115 (internal quotation marks omitted). Because there is no per se rule requiring the exclusion of a juror whose close relative was a victim of a crime similar to that with which a defendant is being tried, *see United States v. Jones*, 608 F.2d 1004, 1008 (4th Cir. 1979), Fulks is obliged, in order to prevail on his *McDonough* claim, to establish that the court clearly disregarded Allison's actual bias against Fulks.

On this point, Fulks contends that inconsistencies in Allison's testimony at the July 16, 2004 hearing demonstrated her actual bias against him. Specifically, he asserts that her explanation for the non-disclosure — that she believed she had answered Question 42 and was thus surprised that she was chosen for jury service — is not credible, and reveals that she deliberately concealed her husband's murder in order to serve on Fulks's jury. The district court, however, explicitly found, based on her "demeanor and body language," that Allison

honestly believed she had disclosed her husband's murder. J.A. 3119. That finding is not clearly erroneous and is entitled to deference. Fulks is thus not entitled to a new trial under *McDonough*.

Moreover, the district court correctly concluded that the circumstances surrounding the murder of Allison's husband, and her failure to disclose it, did not warrant a finding of implied bias. Because it is generally within a trial court's discretion to qualify a juror whose close relative was a victim of a crime similar to that with which a defendant is charged, *see Jones*, 608 F.2d at 1008, such a circumstance is not, standing alone, sufficiently "extreme" to warrant a finding of implied bias, *Fitzgerald*, 150 F.3d at 365. And given the court's finding that Allison's nondisclosure of her husband's murder was inadvertent, the circumstances surrounding the nondisclosure would not support a finding of implied bias. The district court thus did not abuse its discretion in denying Fulks's motion for a new trial.

D.

In his final contention concerning the jurors in his case, Fulks asserts that the district court improperly qualified jurors Novinger and Plyler over his objection. As explained above, we review a district court's qualification of a prospective juror for abuse of discretion, and we may find such an abuse only if a per se rule required a juror's disqualification or if the court "demonstrate[d] a clear disregard for the actual bias" of the juror. *See Turner*, 389 F.3d at 115.

1.

On her written questionnaire submitted prior to the jury selection proceedings, Novinger indicated that her sister had been a victim of sexual assault. When questioned on voir dire, Novinger assured the court that she could be fair, notwithstanding her sister's experience. The court then qualified Novinger over Fulks's objection. As discussed above, there is no per se rule requiring the exclusion of a juror whose close relative was a victim of a crime similar to that with which the defendant is charged. *See Jones*, 608 F.2d at 1008. Thus, the court abused its discretion in qualifying Novinger only if it "demonstrated a clear disregard for [her] actual bias" against Fulks. *Turner*, 389 F.3d at 115. As noted, Novinger assured the court that she could

be fair, and Fulks can point to nothing other than her sister's sexual assault to suggest otherwise. Accordingly, the court did not abuse its discretion in qualifying Novinger as a juror in Fulks's trial.

2.

Fulks's challenge to the qualification of juror Plyler centers on the age similarities between Plyler and her daughter, on the one hand, and Donovan and Burns, on the other. At the time of Fulks's trial, Plyler was the same age as Donovan had been when she was killed (forty-four years old) and Plyler's daughter was close to the same age as Burns had been when she was killed (twenty-one and nineteen years old respectively). When questioned on voir dire concerning her ability to be impartial, Plyler initially equivocated, advising that "[r]ight now I could say I would be fine with being neutral, but getting there and being in front and hearing everything, I don't know. When you put it that way, maybe not. But right now sitting here I say I could." J.A. 613. When pressed on whether the age similarities between her and Donovan, and her daughter and Burns, would influence her decisions as a juror, Plyler asserted that "I would think that, 'Oh my gosh, my daughter is that age. Well, gosh, I'm that age,' that kind of thing, but I think I — I still feel like I could be fair." *Id.* at 613-14. The court then qualified Plyler over Fulks's objection.

As no per se rule requires the exclusion of jurors who have been victims (or whose close relatives have been victims) of a crime similar to that with which the defendant is charged, *see Jones*, 608 F.2d at 1008, it follows *a fortiori* that closeness in age between a prospective juror and her family members, on the one hand, and the victims of a crime, on the other, does not suffice to mandate that the prospective juror be excused for cause. On the question of whether Plyler was actually biased against Fulks, it is clear that, although she was initially unsure that she could be neutral, the court credited her final assertion that she would be fair. That finding is not clearly erroneous, and the district court thus did not abuse its discretion in qualifying Plyler as a juror.

E.

Fulks next asserts that the district court erroneously excluded testimony concerning three polygraph examinations administered to him

prior to trial. *See United States v. Fulks*, CR-02-992 (D.S.C. July 7, 2004). The results of those examinations indicated that Fulks's 2003 statements to the FBI had been truthful and that he neither knew of nor participated in the murders of Burns and Donovan. We review for abuse of discretion a trial court's rulings concerning the admissibility of evidence. *See United States v. Forrest*, 429 F.3d 73, 79 (4th Cir. 2005).

Unfortunately for Fulks, his contention on this point is foreclosed by our decision in *Goins v. Angelone*, 226 F.3d 312 (4th Cir. 2000), *abrogated on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000). In that case, Goins asserted that the prosecutor had committed a *Brady* violation by failing to disclose the results of a polygraph test taken by Barry Scott, who, according to Goins, had committed the murders with which Goins was charged. *See* 226 F.3d at 325. In disposing of Goins's *Brady* claim, we first concluded that, because the record did not reveal which questions Scott had answered untruthfully, there was no basis on which to conclude that the polygraph results were favorable to Goins. *Id.* We also ruled, however, that Goins could not demonstrate that the polygraph results were "material" because polygraph results were inadmissible for any purpose under Virginia law. *Id.* As relevant here, Goins asserted that the Constitution mandated the admissibility of polygraph results during the sentencing phase of his capital trial. We disposed of this contention in a footnote: "[a]s the district court noted, . . . '[U]nder current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings.'" *Id.* at 326 n.7 (quoting *Goins v. Angelone*, 52 F. Supp. 2d 638, 675 (E.D. Va. 1999)). The district court in *Goins* had derived this conclusion from *United States v. Scheffer*, where the Supreme Court upheld, in a noncapital case, the military's per se ban on the admission of polygraph results in court-martial proceedings. *See* 523 U.S. 303, 305 (1998). Although the district court acknowledged that *Scheffer* was a noncapital case, it concluded that "*Scheffer*, with its emphasis on the unreliability of polygraph evidence and the interest of courts in excluding such unreliable evidence, certainly suggests that exclusion of polygraph results would pass constitutional muster in th[e capital] context, as well." 52 F. Supp. 2d at 675.

Although the issue of the admissibility of polygraph results surfaced in *Goins* in the context of a *Brady* claim, we are bound by its

conclusion that "the Constitution does not mandate admission of poly-graph results in capital sentencing proceedings." 226 F.3d at 326 n.7 (internal quotation marks omitted). That conclusion bears directly on the question before us now and, because it disposed of Goins's *Brady* claim (albeit in the alternative), it cannot be properly characterized as dicta. *See MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 346 n.4 (1986) (observing that alternative holdings are not dicta). As a result, *Goins* compels the conclusion that the district court did not abuse its discretion in denying Fulks's motion to admit the results of his polygraph examinations.

F.

Fulks next contends that the district court erred in permitting Judy Ezell, Donovan's sister and a prosecution witness, to read aloud to the jury a 1990 letter from Donovan to Ezell. We, of course, also review the district court's ruling on this evidentiary issue for abuse of discretion. *See Forrest*, 429 F.3d at 79 (observing that we review rulings on admissibility of evidence for abuse of discretion).

As briefly discussed above, the jury heard testimony from Ezell concerning the sexual abuse she and Donovan had suffered at the hands of their father. Ezell testified that, in 1990, she had sent a letter to their father confronting him about the abuse and expressing her willingness to forgive him. She sent a copy of the letter to Donovan, and Donovan replied in a letter that Ezell read, over Fulks's objection, to the jury. In pertinent part, the letter stated as follows:

> The letter that you wrote and sent to Leo was so powerful. You must be on an emotional high. I know I am. Thank you for including me. I cried when I read it over and over again. We are healing. Judy, I wish you were here.
>
> * * *
>
> Before Mom left, she stopped in to say bye . . . . My fear and anger that I carried for her has been lifted. I feel love in my heart for her. And I accept her for herself, not some-one I wanted her to be. I will be that mother to my inner child.

* * *

> In order for me to continue on this path, I have made yet another major decision in my life. George [Donovan's first husband] and I are getting divorced. I cannot and will not live with his abuse. To make a long story short, ha-ha, he got very sexually violent with me. He also threatened to kill me when he was done. This was in July, and, of course, he was drunk. And this is not the first time he has done that. As I lay there crying and waiting to see what he would do next, I made a promise to myself that it would be the last time that he would ever hurt me again, whether he killed me or I survived. Well, I am here to write, I do not deserve to be abused in any way, shape, or form. And I won't be by any man again.

* * *

> Judy, for the first time in my life I have taken back what was taken from me as a small child. I am in control of my life and that is a great, powerful feeling.

J.A. 2544-47.

Fulks now contends that the district court abused its discretion in permitting Ezell to read Donovan's letter to the jury, asserting that the letter was so prejudicial as to deny him due process. In *Payne v. Tennessee*, the Supreme Court — abrogating its prior precedents in *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989) — ruled that the Eighth Amendment erects no per se bar to the admission of victim impact evidence during the sentencing phase of a defendant's capital trial. *See* 501 U.S. 808, 827 (1991). In so ruling, the Court reasoned that the gravity of an offense depends in part on the harm caused by the defendant to the victim, to the victim's family, and to society. *See id.* at 819. Thus, evidence demonstrating that "the victim is an individual whose death represents a unique loss to society and in particular to his family" is generally admissible. *Id.* at 825 (internal quotation marks omitted); *see also id.* at 823 (observing that victim impact evidence "is designed to show . . . *each* victim's uniqueness as an individual human being" (internal

quotation marks omitted)). Also generally admissible is evidence concerning the harm caused to the victim herself. *Id.* at 825. In response to concerns that victim impact evidence would unnecessarily inflame the passions of juries, the Court observed that due process would require exclusion of victim impact evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.*; *see also Barnette*, 211 F.3d at 818 ("To violate due process, an error must be of sufficient significance that it denied the defendant the right to a fair trial.").

As an initial matter, it is clear that Donovan's 1990 letter to Ezell constituted victim impact evidence. First, it served to demonstrate Donovan's uniqueness in that it highlighted struggles Donovan had faced in her life and the strength with which she confronted them. Moreover, the jury could have surmised from the letter that, given her history of abuse and her determination to avoid it in the future, Donovan suffered all the more at the hands of Fulks and Basham (although, as the district court noted, the letter could cut both ways on this point). The issue, then, is whether the reading of the letter to the jury was so unduly prejudicial to Fulks that it offends due process. It is on this contention that Fulks primarily relies.

Fulks first maintains that the letter violated due process because it was neither brief nor current. Put simply, this assertion is without merit. We have held that due process was not violated where seven of the prosecution's twenty-three witnesses were victim impact witnesses who "presented stories of the victims' childhoods, family experiences, and the trauma of their deaths, and poems reflecting their deep sadness and regret over their losses." *Barnette*, 211 F.3d at 818. In that case, the victim impact evidence formed a substantial portion of the prosecution's case at sentencing and included evidence relating as far back as the victims' childhood.

Fulks next asserts that Donovan's letter to her sister was unreliable because it was hearsay and not subject to cross-examination. The relevant inquiry, however, is not whether the letter was admissible under the Federal Rules of Evidence (which do not apply in capital sentencing proceedings), but whether the letter was so unreliable that its admission violated due process. And, although hearsay, Donovan's letter does not bear the hallmarks of unreliability. To the contrary, it

was written in confidence to a close family member, and it was evidently not written with ulterior motives (trickery, in anticipation of litigation, etc.). Although the letter was written with much emotion, this fact cuts towards the letter's reliability. *Cf.* Fed. R. Evid. 803(2) (excepting excited utterances from hearsay rule).

Finally, Fulks contends that the letter improperly focused the jury's attention on the harm that Donovan had suffered during her rape by Fulks and Basham. Because victim impact evidence focuses in part on the harm caused to the victim, *see Payne*, 501 U.S. at 825, this contention is also without merit. The district court thus did not abuse its discretion in permitting Ezell to read Donovan's letter to the jury.

### G.

In his final appellate contention, Fulks asserts that the Federal Death Penalty Act (the "FDPA") is unconstitutional because it withholds the protections of the Federal Rules of Evidence (the "Evidence Rules") from a defendant in a capital sentencing trial, providing only that a district court may exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). We review de novo a district court's ruling concerning the constitutionality of a statute. *United States v. Williams*, 364 F.3d 556, 559 (4th Cir. 2004).

In presenting his contention that the FDPA is unconstitutional, Fulks does not assert that the Evidence Rules must apply to the presentation of evidence on the ultimate issue of whether the aggravating factors present in the case sufficiently outweigh any mitigating factors such that the death penalty should be imposed. *See* § 3593(e) (providing that sentencer must find aggravating factors sufficiently outweigh mitigating factors before imposing death sentence). Indeed, the Supreme Court has already made clear that, in deciding whether a death-eligible defendant should receive the ultimate penalty, "the jury [should] have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (plurality opinion); *see also Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (observing that decision whether death-eligible defendant should receive death penalty "is an *individualized* determination on the basis of the character of the indi-

vidual and the circumstances of the crime" (internal quotation marks omitted)). Rather, relying on the Court's ruling in *Ring v. Arizona*, 536 U.S. 584 (2002), Fulks maintains that the Evidence Rules must govern the presentation of evidence on the threshold question of whether a defendant is eligible for the death penalty — that is, whether the prosecution has proven the existence of at least one statutory aggravating factor beyond a reasonable doubt.

In *Ring*, the Court concluded that the Sixth Amendment right to trial by jury precludes imposition of the death penalty unless an aggravating factor necessary to support that sentence is proven to the jury beyond a reasonable doubt. *See* 536 U.S. at 609. This conclusion derived from the principle first enunciated in *Apprendi v. New Jersey*: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). As the Court explained, regardless of the label a legislature may place on a particular fact, if the finding of such fact results in a sentence more severe than that which the defendant could otherwise receive, the fact "operate[s] as the functional equivalent of an element of a greater offense," and the Sixth Amendment requires that it be found by a jury beyond a reasonable doubt. *Ring*, 536 U.S. at 609 (internal quotation marks omitted).

Fulks does not (and could not) assert that he was denied the essential right guaranteed by the holding in *Ring*: that the prosecution be required to prove to a jury beyond a reasonable doubt the existence of any aggravating factor necessary to impose the death penalty. Rather, Fulks contends that, because an aggravating factor is "the functional equivalent of an element" under *Ring*, the jury's determination of whether such an aggravating factor exists is closer to a trial on guilt or innocence than to a traditional sentencing proceeding. Thus, he asserts, he is constitutionally entitled, with respect to the jury's determination of whether such an aggravating factor is in existence, to the protections of the Evidence Rules.

Even if the Court in *Ring* mandated that a defendant receive, with respect to a jury finding of an aggravating factor, the protections applicable to a guilt-or-innocence trial, it does not follow that the defendant is entitled to the protections of the Evidence Rules. The

Evidence Rules "do not set forth the constitutional parameters of admissible evidence, nor does a criminal defendant have a constitutional right to have the [Evidence Rules] in place." *United States v. Fell*, 360 F.3d 135, 144 (2d Cir. 2004). Indeed, as a general matter, the Evidence Rules provide greater protection than that which is constitutionally mandated. *See, e.g.*, *Dowling v. United States*, 493 U.S. 342, 352-54 (1990) (ruling that due process was not violated by introduction of evidence made inadmissible under Rule 404(b) of the Evidence Rules).

Moreover, the FDPA provides a capital defendant with constitutionally sufficient evidentiary protections. Even without the protections of the Evidence Rules, "it remains for the [district] court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence otherwise admissible under applicable evidentiary rules is excluded from trial." *Fell*, 360 F.3d at 145. The FDPA provides a ready mechanism for a trial court to fulfill this function, permitting the exclusion of evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." § 3593(c). We must rely on the trial courts, in applying this provision, to exclude evidence that transgresses a defendant's constitutional rights. For these reasons, the evidentiary standard of the FDPA withstands constitutional scrutiny. *See United States v. Lee*, 374 F.3d 637, 648 (8th Cir. 2004) (reaching same conclusion); *Fell*, 360 F.3d at 138 (same).

## III.

Pursuant to the foregoing, Fulks's contentions of error are rejected, and the judgment of the district court is affirmed.

*AFFIRMED*

WILLIAMS, Circuit Judge, concurring:

I agree with the judgment reached by the majority and concur in Parts I and II.A.2.b. - III of the majority opinion. While I agree with the result reached in the remainder, I disagree with my good colleagues' interpretation of 18 U.S.C.A. § 3432 (West 2000). I would

instead hold that the district court contravened the statute by allowing Donna Ward and Agent Bruning to testify, but that the error was harmless. I write separately to emphasize the correct reading of the statute, which is "too plain to be misunderstood." *Logan v. United States*, 144 U.S. 263, 304 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510 (1968).

Section 3432 provides in full:

> A person charged with treason or other capital offense *shall* at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of *the witnesses* to be produced on the trial *for proving the indictment*, stating the place of abode of each veniremen and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

18 U.S.C.A. § 3432.[1] The majority holds that this section is not violated when the prosecution calls to the stand a newly discovered witness if "the prosecution has demonstrated that its failure to include the witness on the list was in good faith and not the result of a lack of diligent investigation" and the defendant cannot demonstrate actual prejudice. *Ante* at 19. This exception is not found in the text of the statute and is an entirely judge-made creation.[2]

---

[1] I assume without deciding (as neither party raises the issue) that the statute applies equally to the underlying guilt trial as well as the "separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C.A. § 3593 (West 2000).

[2] I concede, and the majority notes, that the weight of authority is in favor of recognizing a judge-created good faith exception. I note, however, that the reasoning behind this authority is not grounded on the text of the statute, but instead on one faulty 1893 opinion from the Supreme Court of the District of Columbia. In *United States v. Schneider*, 1893 WL 11435 (D.C. Jan. 9, 1893), the court noted that "the statute never was intended to preclude the [Government] from making use of any material testimony discovered during the progress of the trial." *Id.* at *20. For this proposition, the court did not cite a single source or refer to the text of the statute. Rather, it merely offered its view as its "opinion." *Id.*

The only exception to the statute's absolute rule that a listing of "the witnesses . . . for proving the indictment" shall be provided three days prior to trial is where production of "the list may jeopardize the life or safety of any person." 18 U.S.C.A. § 3432. Thus, the plain language of the statute makes no exception for good faith or due diligence on the part of the Government. Indeed, the statute "is . . . mandatory to the [G]overnment; and its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense." *Logan*, 144 U.S. at 304. Thus, according to *Logan*, Congress's concern in passing the statute was with allowing defendants facing possible sentences of death sufficiently to prepare their defense, regardless of whether the statute precluded the Government from introducing some relevant testimony.

In this case, the Government provided a list of *most* of the witnesses it ultimately produced for proving the indictment in ample time under the statute. The statute, however, requires that the defendant be provided with a list "of *the* witnesses to be produced on the trial for proving the indictment." 18 U.S.C.A. § 3432 (emphasis added). Thus,

---

More troubling, in offering this opinion, the *Schneider* court ignored (without even recognizing) the holding of *United States v. Neverson*, 1880 WL 18716 (D.C. June 7, 1880). In *Neverson*, the same court held that the statute is violated when notice of a witness is not "given until after the trial beg[ins]." *Id.* at *13. *But see id.* at *20 (MacArthur, J., concurring) (disagreeing and arguing that the statute should not apply when the Government "us[es] the utmost diligence and exercis[es] the utmost good faith"). *Schneider* also ignored the Supreme Court's language in *Logan v. United States*, 144 U.S. 263, 304 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510 (1968), which recognized that the statute was "mandatory" and "its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense." *Id.*

To compound matters, both circuit courts that have (before today) since recognized the judge-created exceptions (either as alternative holdings or dicta) have primarily relied on *Schneider*'s unsupported language. *See United States v. Green*, 497 F.2d 1068, 1082 (7th Cir. 1974) (quoting *Schneider*'s language); *United States v. Rosenberg*, 195 F.2d 583, 599-600 (2d Cir. 1952) (same).

the statute is no more "silent" on the question of after-discovered witnesses that are offered to prove the indictment, as the majority concludes, *ante* at 16, than it is "silent" on the question of prior-discovered witnesses that are offered to prove the indictment. It speaks only of *the* witnesses, and by using the definite article "the" without relevant exception, the statute's plain language calls for a list of each and every witness to be produced at trial "for proving the indictment," *id.*, not "the witnesses for proving the indictment that to date have been discovered."

The statute is unmistakingly clear that if the Government is to call a witness for the purpose of proving the indictment, the name of that witness must be provided to the capital defendant at least three entire days prior to commencement of trial unless providing the name would jeopardize personal safety. *Cf. Goldsby v. United States*, 160 U.S. 70, 76 (1895) (allowing an undisclosed rebuttal witness to testify because the statute's combination of the phrase "the witnesses" with the phrase "for proving the indictment" "clearly refer[s] to *the witnesses relied upon the by prosecution to establish the charge* [and does] not extend to such witnesses as may be rendered necessary for rebuttal purposes." (emphasis added)). Unless the result reached from following Congress's plain language is absurd (which surely it is not), I think it best for the Court to "interpret[ ] § 3432 'literally'," *ante* at 17 n.6, especially when that literal interpretation is plainly in harmony with what the Supreme Court has explained is the purpose of the statute — to allow a capital defendant to prepare his defense. *Logan*, 144 U.S. at 304.

Aside from the plain language, Congress's relatively recent willingness to amend this statute with an explicit exception further counsels against reading judge-made exceptions into the statute. In 1994, Congress added the exception to the statute's mandatory directive for when production of "the list [of witnesses and veniremen] may jeopardize the life or safety of any person." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Tit. VI, § 60025, 108 Stat. 1982 (1994). The fact that a recent Congress was willing to amend § 3432 with this exception should allay fears that Congress will fail to act in the future if it — like most of the Article III courts that have considered the question — concludes that application of the plain meaning of the statute "would unnecessarily subvert the truth-

seeking function of criminal proceedings." *Ante* at 17. Moreover, when "Congress explicitly enumerates certain exceptions to a general prohibition, *additional exceptions are not to be implied*, in the absence of evidence of a contrary legislative intent." *United States v. Smith*, 499 U.S. 160, 167 (1991) (emphasis added and internal quotation marks omitted).

Finally, I note that I share the majority's instinct that the exception it recognizes is grounded in sound judgment and makes perfect sense as a policy matter. Nonetheless, I believe it is Congress's place — not ours — to make policy and if it so chooses, to amend the statute, as it has shown a willingness to do as recently as 1994. *See Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291, 308 (4th Cir. 2000), *aff'd*, 534 U.S. 438 (2002) ("[E]ven if . . . the literal text of the statute produces a result that is, arguably, somewhat anomalous — we are not simply free to ignore unambiguous language because we can imagine a preferable version."). I also note that even under the plain meaning of § 3432, the Government is not without any recourse because it often will be able to present the after-discovered witness as a rebuttal witness, as the Government contends it could have done in this case. (*See* Appellee's Br. at 55 (arguing that Ward and Bruning "would have made not only appropriate, but also devastating, rebuttal witnesses")).

In short, I would hold that the district court erred in allowing the two witnesses that were not included on the witness list to testify during the prosecution's case-in-chief. Nonetheless, I would find the error harmless after undertaking a traditional Rule 52(a) harmlessness analysis in order "to determine whether the error was prejudicial." *United States v. Olano*, 507 U.S. 725, 734 (1993). I believe that the Government, as evidenced by the majority's persuasive discussion of lack of prejudice in Part II.A.2.b., has met its burden of proving harmlessness. Accordingly, I concur in the judgment reached by the majority.